No. 107,096

STATE OF KANSAS, *Appellee*, v. EDWARD D. LAUREL, *Appellant*.

(325 P.3d 1154)

Opinion filed May 30, 2014.

*Mark T. Schoenhofer*, of Wichita, was on the brief for appellant and waived oral argument.

*Boyd K. Isherwood*, assistant district attorney, argued the cause, and *Nola Tedesco Foulston*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: Defendant Edward D. Laurel appeals from his convictions and sentences for first-degree murder and criminal discharge of a firearm at an occupied building. He challenges the district court judge's denial of his motion for new trial and his sentence to life without parole for 25 years rather than 20 years.

## FACTUAL AND PROCEDURAL BACKGROUND

Teresa Anima heard a loud noise outside of her Wichita house shortly before 6 a.m. on June 20, 2010, and woke her husband, Jose. Teresa and Jose saw two men looking into the windows of a house directly across the street from theirs—one wearing a white jersey and the other wearing a red jersey. Seconds later, the two men started shooting at the front door of the house across the street. Bullets struck and killed a 13-year-old boy inside.

The Animas' daughter dialed 911, and responding officers were informed that one of the shooters was a Hispanic male wearing a white jersey. Minutes later, a patrol vehicle passed a green Jeep with a driver matching that description. The patrol vehicle turned and began to follow the Jeep. When the Jeep voluntarily pulled over to the side of the road, the officer inside the patrol vehicle turned on its overhead lights. The officer then directed the occupants to get out of the Jeep. The driver, Eli Betancourt, was the first to emerge, followed by his brother, Alejandro, and then by Gregory Patton. During a field lineup, witnesses identified Eli as one of the shooters. Neither Alejandro nor Patton was wearing a red jersey, and officers did not find a red jersey in the Jeep. The officers also found no guns were in the Jeep.

After officers took Eli, Alejandro, and Patton into custody, the three were separated and interviewed. Detective Thomas Fatkin interviewed Patton. For more than 2 hours, Patton told the detective that he had been asleep in the Jeep and denied any involvement in the shooting. When an officer entered the interview room and told Patton that he was going to be charged with first-degree murder, Fatkin would eventually testify, "[Patton's] demeanor changed. He talked different. He broke down a little bit. And he began to change his story."

Patton then confessed that he had been at a party with Eli, where many of the attendees were gang members. Patton was drinking and became intoxicated, and, near dawn, he fell asleep in the Jeep. When he awoke, he saw Eli, Alejandro, and a "dude in [a] red shirt" talking outside the Jeep in front of a white house. The three then got into the Jeep with Patton, at which point he saw that the man wearing the red shirt had a gun. The four drove to the victim's house, and, while Patton and Alejandro waited in the Jeep, the two others got out and fired into the home. Alejandro then drove the Jeep to pick up the two shooters. The four returned to the white house where they had been earlier and dropped off the man in the red shirt.

Patton said he did not know the individual in the red shirt, but he had seen him talking with Eli at the party. When presented with a photo array, Patton identified Laurel as the man in the red shirt.

At Laurel's trial on charges of first-degree murder and criminal discharge of a firearm at an occupied building, Patton's testimony tracked his statements during his police interview. He also said that Eli had told him at the party about a plan to retaliate against someone who had fought with another brother of Eli. Patton testified that he did not know when Laurel entered the Jeep that the foursome was setting out to retaliate. It was not until the group drove past the house and Laurel pointed it out that Patton realized they were going to "run up to the house and shoot it." Patton also testified that the group went past the house in the Jeep two more times before stopping to let Eli and Laurel get out. The 13-year-old murder victim was not the intended target.

Patton confirmed before Laurel's jury that he had secured a favorable plea agreement in exchange for his testimony against Eli, Alejandro, and Laurel. Patton pleaded guilty to second-degree murder, and the State joined his request for a dispositional departure to probation. On cross-examination, Laurel's counsel repeatedly emphasized that Patton's plea agreement would allow him to avoid a life sentence and receive probation.

The jury was presented with three options to convict Laurel on the first-degree murder charge.

"Theory 1(a) We, the jury, unanimously find the defendant guilty of murder in the first degree on the theory of premeditated murder.

. . . .

"Theory 1(b) We, the jury, unanimously find the defendant guilty of murder in the first degree on the theory of felony-murder.

. . . .

"Theory 1(c) We, the jury, unable to agree under Theory 1(a) or 1(b), do unanimously find the defendant guilty of murder in the first degree on the combined theories of premeditated murder and felony murder."

The jury chose Theory 1(c) on the first-degree murder. It also convicted Laurel on the criminal discharge count.

Laurel filed a motion for new trial, arguing that he had become aware of new evidence. He had received an in-house, inmate-to-inmate letter or "kite" from Sean Windsor, which said Patton "lied in order to get his plea." Specifically, the kite said: "I was gonna tell you . . . that I was in pod 5 with Greg Pattons rat ass & you

coulda called me as a witness that he told me you wasn't there but had to lie to get a plea." The district judge held an evidentiary hearing on the motion.

At the hearing, Windsor testified that he and Patton had been housed together in the Sedgwick County Detention Facility. His first of two conversations with Patton occurred when Patton approached and confided in him about his case. Patton apparently had overheard Windsor talking, and it had sounded like Windsor "knew a little bit about the legal system." Windsor testified that Patton had told him that he was drunk on the night of the shooting and did not remember anything that had happened. According to Windsor, Patton also said that "the kid Eddie that's charged, my codefendant, he wasn't with us, didn't have nothing to do with nothing."

During a second conversation, Windsor said, Patton told him about being offered a plea deal in exchange for his testimony against his codefendants. Windsor asked Patton how he could testify against anyone if he did not remember what had happened, and Patton replied: "[F]or probation, I will lie."

Cross-examination of Windsor focused on his habits as a "jailhouse lawyer." The prosecutor inquired about several handwritten motions Windsor had drafted for other inmates, and Windsor admitted that he had offered to file a motion on behalf of Laurel based on ineffective assistance of counsel as a "stall tactic." He also admitted that he had written a motion for Alejandro and that the two were friends.

The prosecutor also inquired about a letter, apparently in Windsor's handwriting, in which Windsor had instructed one of his codefendants on how to testify during Windsor's trial. The letter told the codefendant to say that an individual had pointed a gun at her, and it included a drawing of a gun with the instruction: "Tell the cop it looked like this gun." Windsor denied writing the letter.

The prosecutor then asked Windsor about his 31 convictions for crimes of dishonesty. The convictions included felony and misdemeanor thefts, burglary, forgery, unlawful use of an identification card, obstruction of legal process, unlawful use of a financial card, and identity theft.

In response to further cross-examination questions, Windsor admitted that he had not informed anyone other than Laurel or Alejandro about his conversation with Patton. He also admitted that he had refused to talk with a detective who was investigating Patton's alleged statements.

Against the recommendation of his attorney, Eli also testified at the motion hearing. Although he had told investigators that Laurel was involved in the shooting, and he had testified consistently with that statement at his own trial, he changed his story at the motion hearing. He testified that Laurel was not present on the night of the shooting.

Patton also testified at the motion hearing and denied knowing Windsor.

After hearing counsels' arguments, the district judge first addressed Windsor's testimony: "[I]f I w[ere] to assess, and I'll assess, the credibility of Mr. Windsor on a scale of 1 to 10, 1 being the lowest, 10 being the highest, I would judge Mr. Windsor's credibility to be zero. It doesn't even reach to 1. He has no credibility."

The judge then turned to Eli's testimony, saying: "[B]ased on his own admission[,] I, again on a scale of 1 to 10, 1 being the lowest, 10 being the highest, Mr. Eli Betancourt has zero credibility." The district judge reasoned that Eli had perjured himself, either at his own trial or in the motion hearing, and his mutually exclusive accounts of Laurel's involvement in the shooting made him unbelievable.

Finally, the judge said: "[O]f the three witnesses who testified, [Patton's] testimony is believable, whereas the other two are not." Given his credibility assessments, the district judge denied the motion for new trial.

At the sentencing that followed, the prosecutor and defense counsel agreed that the jury's selection of a combined theory for the first-degree murder conviction required imposition of a felony-murder sentence rather than a premeditated murder sentence, which meant the possibility of Laurel's parole in 20 years rather than 25 years. But the district judge said: "[W]hen you intermix or blend the elements of the crime of first-degree, premeditated murder and felony murder, you do not lose the element of premedi-

tation[.] Rather you combine all the elements together as one combined element of those crimes." The district judge concluded that "[t]hese combined elements" allowed a sentence of life imprisonment with no possibility of parole for 25 years. Finally, he said that the sentence "no doubt . . . ultimately will invite an appeal," but he could not "in good consc[ience]" sentence Laurel, one of the shooters, to a life sentence with a 20 year minimum, while Alejandro, who had stayed in the Jeep during the shooting, had received a life sentence with a 25-year minimum. The judge gave Laurel a consecutive sentence of 13 months' imprisonment for the criminal discharge of a firearm conviction.

Laurel's notice of appeal read: "Notice is hereby given by the Defendant, Edward Laurel, . . . of Mr. Alvarez's intention to appeal the motions, conviction, judgment, sentence, and all adverse judgments, rulings and findings of fault entered by the District Court in the above case to the Court of Appeals of the State of Kansas."

## DISCUSSION

*Notice of appeal*

Before reaching the merits of Laurel's arguments on appeal, we address the State's assertion that Laurel's notice of appeal "is defective to such an extent as to cause this court to question its own jurisdiction."

Statutory interpretation and the determination of jurisdiction present questions of law over which this court's scope of review is unlimited. *State v. Burnett,* 297 Kan. 447, 451, 301 P.3d 698 (2013).

K.S.A. 2011 Supp. 60-2103(b) provides that "[t]he notice of appeal shall specify the parties taking the appeal; shall designate the judgment or part thereof appealed from, and shall name the appellate court to which the appeal is taken." We liberally construe K.S.A. 60-2103(b) " 'to assure justice in every proceeding,' " *State v. Wilkins,* 269 Kan. 256, 270, 7 P.3d 252 (2000) (quoting *State v. Griffen,* 241 Kan. 68, 70, 734 P.2d 1089 [1987]); but there is still a substantive minimum below which a notice cannot fall and still support jurisdiction. See, *e.g., State v. Coman,* 294 Kan. 84, 90, 273 P.3d 701 (2012) (notice of appeal for sentence cannot be con-

strued to support appeal of conviction); *State v. G.W.A.*, 258 Kan. 703, 707, 906 P.2d 657 (1995) (State's appeal from judgment of acquittal insufficient to confer jurisdiction over question reserved); *Gates v. Goodyear*, 37 Kan. App. 2d 623, 626-29, 155 P.3d 1196 (notice of appeal citing two specific district court rulings insufficient to confer jurisdiction over issues not addressed in those rulings), *rev. denied* 284 Kan. 945 (2007).

The State argues that Laurel's notice of appeal is insufficient to confer jurisdiction because of three shortcomings: (1) the reference to a "Mr. Alvarez," who was not a party in this case; (2) the naming of the wrong appellate court; and (3) a failure to include "a statutory citation for the authority to directly appeal" to this court. The State does not argue that it was misled, surprised, or prejudiced by any of these relatively superficial errors.

Observing that a notice of appeal need not be overly technical or detailed, we have generally considered whether the State has been prejudiced by a defendant's timely filed but otherwise faulty notice of appeal. See 269 Kan. at 270 (State did not show surprise, prejudice); *Griffen*, 241 Kan. at 70 (State not misled, surprised, prejudiced by notice of appeal).

In *Wilkins*, we stated:

"Given that the notice of appeal 'should not be overly technical or detailed'; that the 'State does not generally take any significant action when receiving a notice of appeal'; that the typographical error in this case 'does not harm or even affect the State in any appreciable way'; that the State has not shown surprise or prejudice; that this court is to construe K.S.A. 60-2103(b) liberally to assure justice in every proceeding; and that actions should be just, speedy, and inexpensively determined, we hold that the 'judgment of sentence' language found in Wilkins' notice of appeal sufficiently conferred jurisdiction on the Court of Appeals to determine the substantive issues raised . . . ." 269 Kan. at 270.

The State cites our recent *State v. Berreth*, 294 Kan. 98, 273 P.3d 752 (2012), opinion and argues that we now apply a more exacting analysis to an appellant's notice of appeal. In *Berreth*, we held that the State could not change the sole statutory jurisdictional basis it had asserted in its notice of appeal. 294 Kan. at 112. The *Berreth* opinion, however, is distinguishable because it addressed

the State's notice of appeal rather than a defendant's. We noted the distinction in *Berreth*:

"[T]he State's statutory authority to appeal, when compared to the criminal defendant's, is very limited. 'While the State only has limited appeal rights, a criminal defendant has a nearly unlimited right of review.' *State v. Boyd*, 268 Kan. 600, 605-08, 999 P.2d 265 (2000); see also *State v. Walker*, 260 Kan. 803, 806, 926 P.2d 218 (1996) (noting that appeals by the State in criminal cases are tightly restricted by statute)." 294 Kan. at 110.

Our opinion in *Berreth* did not substantially alter the quality of this court's review of a criminal defendant's notice of appeal.

The State first alleges insufficient notice of appeal based on a typographical error. In the body of the notice of appeal, it identified a "Mr. Alvarez" where one would expect to see "Mr. Laurel" instead. Considering the fact that the notice was properly captioned, we are unpersuaded that the State was "harm[ed] or even affect[ed] . . . in any appreciable way" by the typographical error. See *Wilkins*, 269 Kan. at 270 (discussing typographical error in notice of appeal).

Next, the State points out that Laurel's notice of appeal was directed "to the Court of Appeals of the State of Kansas." Again, the State does not argue that it was misled or disadvantaged by Laurel's identification of the incorrect appellate court. See *Alliance Mutual Casualty Co. v. Boston Insurance Co.*, 196 Kan. 323, 326-27, 411 P.2d 616 (1966) (absence of " 'to the Supreme Court' " in notice of appeal not ground for dismissal; irregularity disregarded unless appellee misled). There was never any confusion as to which court would hear Laurel's appeal. See K.S.A. 2011 Supp. 22-3601(b)(3) ("Any appeal permitted to be taken from a district court's final judgment in a criminal case shall be taken directly to the supreme court in . . . any case in which a maximum sentence of life imprisonment has been imposed.").

Finally, the State points to the notice's failure to cite the statutory basis for Laurel's appeal. See Supreme Court Rule 2.01 (2011 Kan. Ct. R. Annot. 9) (form of notice should state ground on which direct appeal permitted). Again, the State does not identify how it was prejudiced by this omission, and we will not hold that it poses a jurisdictional obstacle.

*Motion for new trial*

This court reviews a district court's decision on a motion for new trial based on newly discovered evidence for abuse of discretion. *State v. Backus*, 295 Kan. 1003, 1011, 287 P.3d 894 (2012); *State v. Rojas-Marceleno*, 295 Kan. 525, Syl. ¶ 11, 285 P.3d 361 (2012). Judicial action constitutes an abuse of discretion if the action (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). Laurel bears the burden of demonstrating an abuse of discretion. See *State v. Hulett*, 293 Kan. 312, 319, 263 P.3d 153 (2011).

A court considers two factors when determining whether a new trial is warranted on the basis of newly discovered evidence: (1) whether the new evidence could not, with reasonable diligence, have been produced at trial, and (2) whether the evidence is of such materiality that it would be likely to produce a different result upon retrial. *Backus*, 295 Kan. at 1011; *Rojas-Marceleno*, 295 Kan. at 540.

The first fact was not truly in issue at the hearing on Laurel's motion; the district judge treated the evidence from Windsor and Eli as newly discovered. But materiality and the likelihood that the new evidence could change the result on retrial was in issue.

In *Rojas-Marceleno*, we explained:

"In determining whether newly proffered evidence is material, the district court must assess the credibility of the newly proffered evidence. [Citations omitted.] Ordinarily, a new trial is not warranted when the newly proffered evidence merely tends to impeach or discredit the testimony of a witness. [Citations omitted.] [And], even when the evidence tends to impeach the testimony of a witness, the presence or absence of corroborating evidence is another factor to consider in determining whether the newly discovered evidence is of such materiality that it is likely to produce a different result upon retrial. [Citations omitted.]" 295 Kan. at 540.

In this case, the district judge made specific findings that Windsor and Eli entirely lacked credibility. These findings were supported by Windsor's lengthy record of convictions for crimes of dishonesty and Eli's prior contradictory sworn testimony. We do

not reassess a district judge's determination of credibility at a motion for new trial hearing. 295 Kan. at 542-43. Zero credibility means zero materiality and zero chance that the outcome of a retrial would be different.

Moreover, we observe that Patton's credibility had already been challenged during Laurel's trial, including vigorous questioning about his drunkenness, the lapse of time between his initial denials and confession, his reaction to being told that he would be prosecuted for first-degree murder, his favorable plea agreement, and his review of discovery material from the prosecution in order to "fill in a lot of the details." Despite these questions, Laurel's jury obviously found Patton to be credible, another finding that we do not revisit on appeal. See *State v. Qualls*, 297 Kan. 61, Syl. ¶ 1, 298 P.3d 311 (2013) (appellate courts do not make witness credibility determinations).

The district judge did not abuse his discretion when he denied Laurel's motion for new trial.

*Sentencing error*

The determination of whether a sentence is illegal raises a question of law over which this court has unlimited review. *State v. LaBelle*, 290 Kan. 529, 532, 231 P.3d 1065 (2010).

"An illegal sentence is a sentence imposed by a court without jurisdiction, a sentence which does not conform to the statutory provision, either in character or the term of the punishment authorized, or a sentence which is ambiguous with regard to the time and manner in which it is to be served." 290 Kan. 529, Syl. ¶ 1.

Laurel argues that the district judge erred in sentencing him to the mandatory minimum imprisonment term for premeditated murder rather than the mandatory imprisonment term consistent for felony murder. Although both crimes contemplate a term of life imprisonment, a defendant sentenced for felony murder is parole-eligible after 20 years while a defendant sentenced for premeditated murder is parole-eligible after 25 years. See K.S.A. 22-3717(b)(1) and (2).

Laurel is correct. " 'Where the sentencing court cannot ascertain whether the jury unanimously convicted the defendant of both pre-

meditated murder and felony murder, the sentencing court has no authority for sentencing the defendant for premeditated murder.' " *State v. Kesselring*, 279 Kan. 671, 684, 112 P.3d 175 (2005) (quoting *State v. Vontress*, 266 Kan. 248, 264, 970 P.2d 42 [1998], *disapproved of on other grounds by State v. Schoonover*, 281 Kan. 453, 133 P.3d 48 [2006]); see *State v. Hoge*, 276 Kan. 801, 804, 80 P.3d 52 (2003) (divided jury convicted defendant of first-degree murder under combined theories of premeditated murder and felony murder without reaching agreement on the underlying theory; defendant sentenced to life imprisonment with parole eligibility after 20 years, consistent with felony-murder conviction).

In this case, the jury specifically indicated by choosing Theory 1(c) that its members could not agree on a single theory of culpability on the first-degree murder charge. There were not 12 votes in favor of conviction for premeditated murder. The district judge thus was not permitted to sentence Laurel for that crime, regardless of any sentence imposed by that judge or any other judge on the three other participants in the crime. Laurel's first-degree murder sentence must be vacated and the case remanded for resentencing.

## CONCLUSION

The district judge did not abuse his discretion when he denied Laurel's motion for new trial, but the district judge was without authority to sentence Laurel to life imprisonment with no possibility of parole for 25 years for the first-degree murder conviction. Laurel's convictions for first-degree murder and criminal discharge of a firearm at an occupied building are affirmed. His sentence for first-degree murder is vacated, and the case is remanded for resentencing.

Convictions affirmed, sentences affirmed in part and vacated in part, and case remanded.

MORITZ, J., not participating.