IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 116,648

STATE OF KANSAS,
*Appellee*,

v.

ALEJANDRO ARTURO GARCIA-GARCIA,
*Appellant*.

SYLLABUS BY THE COURT

1.

Whether appellate jurisdiction exists is a question of law over which an appellate court has unlimited review.

2.

Statutory interpretation is subject to unlimited appellate review.

3.

An appellate jurisdiction question may be raised at any time and may also be raised sua sponte by a court.

4.

The contemporaneous objection rule under K.S.A. 60-404 is not satisfied by objecting to the introduction of evidence on one ground at trial and arguing another ground on appeal.

5.

K.S.A. 2017 Supp. 60-455 governs the admissibility of other crimes evidence. Generally, evidence a person committed a crime or civil wrong on a prior specified

1

occasion is inadmissible to prove that person's disposition to commit crimes or civil wrongs as a basis for an inference that the person committed another crime or civil wrong on another specified occasion, unless such evidence is admissible as relevant to prove some other material fact, such as motive.

6.

To determine prosecutorial error, an appellate court decides whether the act complained of falls outside the wide latitude afforded to prosecutors to conduct the State's case in a way that does not offend the defendant's constitutional right to a fair trial. If it finds error, the appellate court next determines if that error prejudiced the defendant's right to a fair trial.

7.

When evaluating the prejudice step for reversible prosecutorial error, an appellate court applies the traditional constitutional harmlessness inquiry from *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). Prosecutorial error during a trial is harmless if the State shows beyond a reasonable doubt the error did not affect the trial's outcome in light of the entire record, i.e., there is no reasonable possibility the error contributed to the verdict.

8.

A sentencing court assessing fees to reimburse the Board of Indigents' Defense Services under K.S.A. 22-4513 must consider on the record at the time of assessment the defendant's financial resources and the burden that paying the fees will impose.

Appeal from Montgomery District Court; JEFFREY D. GOSSARD, judge. Opinion filed May 10, 2019. Convictions affirmed, sentence vacated in part, and case remanded with directions.

*Clayton J. Perkins*, of Capital Appellate Defender Office, argued the cause and was on the brief for appellant.

*Steven J. Obermeier*, assistant solicitor general, argued the cause, and *Derek Schmidt*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

BILES, J.:  A jury convicted Alejandro Garcia-Garcia of attempted capital murder, kidnapping, burglary, and interference with law enforcement. His Kansas crimes arose from a high-speed car chase that began in Oklahoma. In this direct appeal, Garcia-Garcia raises four issues:  (1) the relevancy and undue prejudice of evidence about his criminal acts in Oklahoma, (2) prosecutorial error, (3) jury instruction error, and (4) the court's order that he pay a percentage of the attorney fees incurred for his defense. Before discussing these, we first consider an appellate jurisdiction question raised sua sponte and hold jurisdiction is proper. We affirm the convictions, vacate the attorney fees assessment, and remand to the district court with directions to reconsider that assessment.

## FACTUAL AND PROCEDURAL BACKGROUND

This appeal can be broken down into three separate but related incidents. We briefly describe them now and will provide more detail when addressing the applicable issue.

*The high-speed chase in Oklahoma*

This began when an Oklahoma police officer pulled Garcia-Garcia over for speeding. He had two passengers in his vehicle—one in the front seat and another in the back. Garcia-Garcia gave the officer his ID, which was invalid. Another officer arrived as

3

backup. An officer instructed Garcia-Garcia to turn off the vehicle's engine, but he refused and drove away. The officers pursued in their respective patrol cars. During the chase, gunshots were fired from a rear window of Garcia-Garcia's vehicle. An officer was shot in the forehead and his car crashed. He survived his injuries.

*The Kansas kidnapping*

Law enforcement officers ended the vehicle chase by deploying stop strips near the Kansas border. Garcia-Garcia fled on foot. He saw Stanley Shafer Jr. standing by a truck outside a house. Shafer agreed to give him a ride. While in the truck, Garcia-Garcia showed Shafer a gun and gestured with it to continue driving beyond where Shafer had initially intended to take him. Shafer later testified he was scared and felt he had no choice. Shafer saw a friend fishing at a bridge and stopped to talk with him. Shafer took the keys with him so Garcia-Garcia could not drive away.

*The attempted capital murder*

While at the bridge, Garcia-Garcia flagged down another truck driven by David Henderson, who agreed to take him to Liberty, Kansas. As they drove, Garcia-Garcia asked Henderson to drive to Garnett. Henderson declined, refusing Garcia-Garcia's offer to pay him $500. They saw a sheriff's car as they approached Liberty. Garcia-Garcia ducked down when they passed and asked Henderson what the sheriff's car was doing. Henderson said it turned around and was following them. When Henderson stopped, Deputy Michael Grimes pulled up about 90 feet behind Henderson's vehicle.

The stories conflict about what happened next. Henderson heard Grimes say, "Let me see your hands." He turned and put his hands out the window. By that time, Garcia-

4

Garcia was outside the truck, holding a gun. Henderson heard gunshots and then blacked out when Grimes shot him in the neck.

Grimes testified Garcia-Garcia fired first, so he returned fire. Grimes was in front of his patrol car. Realizing he had no cover, he tried to run backwards to his car but tripped and fell. Grimes said Garcia-Garcia continued shooting after he fell. When Grimes returned to his car, he saw Garcia-Garcia running away.

In a later police interview, Garcia-Garcia said Grimes shot first. He told investigators he accidentally fired one shot toward the truck's rear. He repeatedly said he only fired once but agreed it was possible he fired more because he was scared. He said after he fired his single shot, he saw Grimes fall to the ground. He then ran to a nearby house. He was found inside in a closet, hiding under some clothes.

At trial, a KBI agent testified about the physical evidence. The agent said investigators found four bullet casings matching Garcia-Garcia's pistol. The agent noted their location corroborated Garcia-Garcia's claim he fired a shot toward the truck's back. He also testified the physical evidence could not determine what order any particular shot was fired. Likewise, he noted both civilians and law enforcement are bad at estimating the number of shots fired in high stress situations.

A jury found Garcia-Garcia guilty of attempted capital murder of Grimes, kidnapping Shafer, burglary, and interference with law enforcement. The district court imposed a hard 25 life sentence for the attempted capital murder conviction with consecutive presumptive sentences for the remaining convictions. Garcia-Garcia now brings this direct appeal.

Attempted capital murder is an off-grid offense. K.S.A. 2015 Supp. 21-5401(c). Conviction requires a hard 25 life sentence. K.S.A. 2015 Supp. 21-6620(a)(2)(A). This court has direct appellate jurisdiction over convictions of all life sentence and off-grid offenses, except those under Jessica's Law. K.S.A. 2016 Supp. 22-3601(b)(3), (4).

But Garcia-Garcia filed his notice of appeal, stating: "Defendant hereby appeals *to the Kansas Court of Appeals* in the above referenced case." (Emphasis added.) We ordered Garcia-Garcia to show cause how his notice of appeal conferred appellate jurisdiction and suggested his notice was potentially defective because a notice of appeal "[1] *shall designate the judgment or part thereof appealed from*, and [2] *shall name the appellate court to which the appeal is taken*." (Emphases added.) K.S.A. 2017 Supp. 60-2103(b).

Garcia-Garcia responded that his notice should be considered jurisdictionally sufficient, citing *State v. Boyd*, 268 Kan. 600, 607, 999 P.2d 265 (2000) (holding notice of appeal sufficient to give Court of Appeals jurisdiction by stating defendant "'appeals from his conviction in the above captioned matter'"). He claimed the notice made clear he was appealing from his criminal conviction although he did not mention it. He reasoned the State would be no more prejudiced by his notice than by one with generic language because the State would learn the issues on appeal by reviewing his brief.

As to incorrectly naming the court to which his appeal is taken, he argued naming the Court of Appeals instead of the Supreme Court should also not be a jurisdictional defect, citing *State v. Laurel*, 299 Kan. 668, 325 P.3d 1154 (2014). But in *Laurel*, the court held a notice of appeal incorrectly directed to the Court of Appeals presented no

jurisdictional obstacle unless the State was misled or disadvantaged by the error. 299 Kan. at 675. That is not claimed here.

Garcia-Garcia explained he first docketed his case with the Court of Appeals because he considered K.S.A. 2016 Supp. 22-3601(b) ambiguous on which appellate court had jurisdiction. He also believed his case could be transferred to this court since his conviction of attempted capital murder was an off-grid felony carrying a hard 25 life sentence. See K.S.A. 2016 Supp. 22-3601(b)(3) (direct appeal when "a maximum sentence of life imprisonment has been imposed"); K.S.A. 2016 Supp. 22-3601(b)(4) (direct appeal when "the defendant has been convicted of an off-grid crime").

Garcia-Garcia further suggested 2016 Supp. 22-3601(b)(4), not subsection (3), might control because his conviction "was a post-1993 conviction of an attempt of an off-grid crime," citing *State v. Cameron*, 294 Kan. 884, 899, 281 P.3d 143 (2012). He pointed out that if subsection (b)(4) applied, it "would appear to exclude a conviction of attempted capital murder as a crime subject to this Court's direct review" because of subsection (b)(4)(G) ("The provisions of this paragraph shall not apply to any case in which the off-grid crime was . . . an attempt . . . of *any such felony*." [Emphasis added.]).

We ordered additional briefing to address "whether appellate jurisdiction arises under K.S.A. 2016 Supp. 22-3601(b)(3) or K.S.A. 2016 Supp. 22-3601(b)(4)(G)."

*Standard of review*

Whether appellate jurisdiction exists is a question of law over which this court has unlimited review. *State v. Looney*, 299 Kan. 903, 906, 327 P.3d 425 (2014). To the extent the court's inquiry requires statutory interpretation, this court also exercises unlimited review. 299 Kan. at 906.

*Discussion*

Our general jurisdiction derives from Article 3, § 3 of the Kansas Constitution, which declares the Supreme Court "shall have . . . appellate jurisdiction as may be provided by law." As a result, this court may exercise appellate jurisdiction as statutorily specified. *Harsch v. Miller*, 288 Kan. 280, 287, 200 P.3d 467 (2009). A jurisdictional question may be raised at any time and may also be raised sua sponte by the appellate court. *State v. Gayden*, 281 Kan. 290, 293, 130 P.3d 108 (2006).

K.S.A. 2016 Supp. 22-3601(b) provides four enumerated circumstances under which a district court's final judgment in a criminal case must be appealed directly to this court. Under subsection (b)(3), this court has direct appellate jurisdiction over "any case in which a maximum sentence of life imprisonment has been imposed, unless the maximum sentence has been imposed pursuant to [Jessica's Law]." As Garcia-Garcia received a hard 25 life sentence for attempted capital murder, which was mandated by K.S.A. 2017 Supp. 21-6620(a)(2)(A), not Jessica's Law, his appeal must be taken to this court.

Garcia-Garcia's initial suggestion that 22-3601 (b)(4) may control misconstrued the statute. The four enumerated circumstances each provide an independent basis for this court's jurisdiction. Even if his crime was an "attempt . . . of any such [off-grid crime]" to which subsection (b)(4) by its terms does not apply, the appeal must still be taken to the Supreme Court because of subsection (b)(3). The statute's plain and unambiguous language makes clear this court has jurisdiction over any case fitting any one or more of the four listed types. See *State v. Parker*, 309 Kan. 1, 14, 430 P.3d 975 (2018) ("'When a statute is plain and unambiguous, this court looks to its plain language.'").

8

Said differently, even if (b)(4) does not mandate Supreme Court jurisdiction in Garcia-Garcia's case, jurisdiction remains independently required by (b)(3). See, e.g., *State v. Williams*, 308 Kan. 1320, 429 P.3d 201 (2018) (off-grid crime; direct appeal under [b][4]); *State v. Brune*, 307 Kan. 370, 409 P.3d 862 (2018) (life sentence; direct appeal under [b][3]); *State v. Lee*, 306 Kan. 624, 395 P.3d 418 (2017) (life sentence imposed for a class A felony offense; direct appeal under [b][2] and [3]); *State v. Corbin*, 305 Kan. 619, 386 P.3d 513 (2016) (life sentence imposed for an off-grid crime; direct appeal under [b][3] and [b][4]). And because Garcia-Garcia's life sentence requires an appeal directly to this court under K.S.A. 2016 Supp. 22-3601(b)(3), there is no need to consider whether Garcia-Garcia's appeal fits within the exception to subsection (b)(4) jurisdiction set out under subsection (b)(4)(G).

We hold this court has jurisdiction despite the misdirected notice of appeal.

EVIDENCE OF CRIMINAL ACTS IN OKLAHOMA

Before trial, the State filed a notice of intent to present other crimes evidence about the Oklahoma events. This included the chase, shooting, and officer's car crash. The notice claimed this evidence was admissible to establish Garcia-Garcia's motive and intent for the attempted premeditated murder charge in Kansas as well as the basis for the remaining charges. Around the same time, Garcia-Garcia filed a motion in limine to exclude mentioning any Oklahoma events. He argued this evidence was irrelevant to his charged crimes and highly prejudicial.

The court denied Garcia-Garcia's motion in limine, finding:

"[The Oklahoma] evidence does relate to the factual basis for the underlying felony . . . [and] is admissible under K.S.A. 60-455 as the evidence is relevant to prove a material

9

fact, . . . this material fact is disputed, and . . . the probative value of the evidence is not substantially outweighed by its prejudicial effect."

At trial, the court overruled Garcia-Garcia's objection to the Oklahoma evidence and allowed a continuing objection. At the end of trial, the court instructed the jury the Oklahoma evidence could be considered solely to prove Garcia-Garcia's motive and intent, and as set forth in the kidnapping instruction. That kidnapping instruction stated Garcia-Garcia was charged with kidnapping Shafer "to facilitate flight from the commission of any crime, to wit: endangering another while eluding an officer."

*The Oklahoma evidence*

We summarize the Oklahoma evidence, as provided by the officers: On May 28, 2015, Stephen D. Pales, an Oklahoma police officer, pulled over a vehicle driven by Garcia-Garcia for speeding. A female, later identified as Roxanne, was in the front passenger seat, and a male, later identified as Cesar, was in the back. Garcia-Garcia handed Pales his ID and expired insurance information. The officer saw beer bottles inside the vehicle and smelled the odor of beer. Pales told the occupants to stay where they were and returned to his patrol car. He checked the ID and found it was invalid. Officer Charles Neill arrived as backup. The two officers returned to Garcia-Garcia's vehicle and instructed him to turn off the engine. He refused and drove off.

The officers pursued in their individual patrol cars. Several gunshots were fired out the rear window of Garcia-Garcia's car. Pales briefly pulled off the road after his windshield was shot but soon rejoined the pursuit. When cross-examined, Pales said he was unable to see who was firing but thought it would not be possible for Garcia-Garcia to shoot through the rear passenger side window while operating the vehicle at a high rate of speed. During redirect, Pales clarified Garcia-Garcia could not have fired the shot that

hit his windshield. But, he added, it was possible shots came from the driver's window during the chase. Neill testified the initial shot was from the driver's side of the vehicle, but he could not tell who did the shooting.

Oklahoma law enforcement placed stop strips along the road but failed to disable the vehicle. Pales notified Kansas authorities they were approaching the border and learned Kansas officers set up additional stop strips near Coffeyville. As the chase neared the state line, Pales saw Neill's car stuck in traffic. After this, Neill's car veered off the road, went into an embankment, and then violently rolled.

Pales pulled over to help Neill, whose car was upside down and emitting smoke and gasoline. Pales beat on the car's window, yelling at Neill, but got no response. Pales and another officer pulled Neill out. Neill stood up with his face covered in blood, complaining that his head hurt. Pales saw a bullet wound in Neill's forehead.

*Preservation*

To claim error on appeal, those opposed to admission of evidence must make clear the specific grounds for objection during trial. K.S.A. 60-404. The State challenges whether Garcia-Garcia's arguments are properly preserved for our review. We consider that first.

Garcia-Garcia's motion in limine argued any evidence relating to the Oklahoma events was irrelevant "to the events with which the Defendant is charged" and highly prejudicial. The district court considered these arguments at a pretrial hearing. Garcia-Garcia focused mostly on whether the evidence was unduly prejudicial because "[i]f the jurors hear that there were allegations of shots being fired at officers down there that presupposes them, I believe, to presume my client did what the State is alleging . . . ." In

11

response, the State asserted the evidence was relevant because it showed motive when Garcia-Garcia shot at Grimes and established "his intent as to why he was doing what he was doing which was to escape what they had done in Oklahoma." The State agreed the evidence was prejudicial but disagreed it was unduly prejudicial.

On appeal, Garcia-Garcia does not contest that intent and motive to commit murder were facts material to the attempted capital murder charge. Instead, he asserts much of the State's evidence—particularly the Neill shooting and later events—was not relevant because Garcia-Garcia did not know they occurred. He admitted Cesar told him he hit a patrol car, but claims he did not know what happened after that. He essentially maintains the State's evidence went beyond what was necessary to prove intent and motive.

As for prejudice, Garcia-Garcia insists the evidence's potential for undue prejudice outweighed its probative value. This is premised on his argument that the Oklahoma evidence had low probative value because the events were unknown to him, so they had little bearing on what motivated his later actions. He also argues the trial court improperly left the jury with the impression Garcia-Garcia was a "'general[] wrongdoer' that had been previously involved with injuring law enforcement."

But during a pretrial hearing, Garcia-Garcia relied mostly on a prejudice argument, while making only a general relevancy challenge to the evidence about the chase, shooting, and wreck of Neill's car. He referred back to that argument at trial by simply stating for the record, "I'd like to make my contemporaneous objection . . . . This is based on arguments that have previously been made . . . ." Our question now is: May a party lodge only a general relevance objection to a category of testimony, and then on appeal raise a specific ground targeting particular facts within that testimony, when the

12

trial court had no opportunity to address the specific argument advanced on appeal? We have answered that question before in the negative.

Under K.S.A. 60-404, "'evidentiary errors shall not be reviewed on appeal unless a party has lodged a timely and specific objection to the alleged error at trial.'" *State v. Moore*, 302 Kan. 685, 697, 357 P.3d 275 (2015); see also *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015) ("Without a contemporaneous objection, [defendant's] claim is being asserted for the first time on appeal and is subject to the general rule that alleged [error] cannot be raised for the first time on appeal."). The court in *State v. Richmond*, 289 Kan. 419, 428-29, 212 P.3d 165 (2009), declined to review unpreserved evidentiary matters, holding "the trial court must be provided the specific objection so it may consider as fully as possible whether the evidence should be admitted and therefore reduce the chances of reversible error." 289 Kan. at 429. The contemporaneous objection rule is not satisfied by objecting on one ground at trial and arguing another ground on appeal because it would undercut the statute's purpose. 289 Kan. at 429.

The district court never had a chance to rule on Garcia-Garcia's argument that Neill's injury and the damaged patrol car were irrelevant because he was not aware of them at the time of his Kansas crimes. We hold this claim as framed is not preserved. As a result, we focus on what Garcia-Garcia argued below and the district court's ruling.

*Standard of review*

K.S.A. 2017 Supp. 60-455 governs the admissibility of other crimes evidence. The statute provides:

"(a) Subject to K.S.A. 60-447, and amendments thereto, evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove such

13

person's disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion.

"(b) Subject to K.S.A. 60-445 and 60-448, and amendments thereto, such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

A trial court uses a three-step test when deciding whether to admit 60-455 evidence, and an appellate court employs a different standard in reviewing the trial court's decision. In step one, the trial court must determine whether the fact to be proven is material, i.e., """this fact has some real bearing on the decision in the case,""" and the appellate court reviews this independently with no deference to the lower court. *State v. Haygood*, 308 Kan. 1387, 1392, 430 P.3d 11 (2018). In step two, the trial court must decide whether the material fact is disputed, and if so, whether the evidence at issue is relevant to proving the disputed material fact. In doing so, the trial court considers if the evidence has any tendency in reason to prove the disputed material fact. The appellate court reviews this for abuse of discretion. In step three, the trial court must determine whether the evidence's probative value outweighs the potential for undue prejudice against the accused. An appellate court again reviews this for abuse of discretion. 308 Kan. at 1392-93.

A trial court abuses its discretion when no reasonable person would take the view adopted by it, when the judicial action is based on an error of law, or when the judicial action is based on an error of fact. *State v. Gonzalez*, 307 Kan. 575, 593, 412 P.3d 968 (2018).

*Discussion*

Step one can be addressed easily. At trial, the district court instructed the jury the Oklahoma evidence could be considered solely to establish Garcia-Garcia's motive and intent, and as set forth in the kidnapping instruction, which required the jury to determine whether the kidnapping was done with the specific intent "to facilitate flight from the commission of any crime, to wit: endangering another while eluding an officer." Garcia-Garcia correctly does not dispute that his motive and intent were material facts for the charged offenses, particularly attempted capital murder and kidnapping. See K.S.A. 2017 Supp. 60-455(b) ("[S]uch evidence is admissible when relevant to prove some other material fact including *motive*, opportunity, *intent*, preparation, plan, knowledge, identity or absence of mistake or accident." [Emphases added.]); K.S.A. 2017 Supp. 21-5401(a)(5) ("*intentional* and premeditated killing of a law enforcement officer" [emphasis added]); K.S.A. 2017 Supp. 21-5408(a)(2) ("Kidnapping is the taking or confining of any person, accomplished by force, threat or deception, with the *intent* to hold such person . . . to facilitate flight or the commission of any crime." [Emphasis added.]); *Haygood*, 308 Kan. 1387, Syl. ¶ 2 ("Although motive is not an element of premeditated first-degree murder, evidence of its existence can be highly persuasive circumstantial evidence of guilt. Therefore, evidence of prior crimes or civil wrongs relevant to prove the defendant's motive to commit premeditated first-degree murder can be admissible under K.S.A. 2017 Supp. 60-455.").

In step two, we determine whether the material facts were disputed, and if so, whether the district court abused its discretion concluding the Oklahoma evidence was relevant to proving those disputed material facts. "'Relevant evidence' means evidence having *any* tendency in reason to prove any material fact." (Emphasis added.) K.S.A. 60-401(b). Again, Garcia-Garcia does not contest that motive and intent were disputed. Instead, he challenges the evidence's relevance to those points. But it is obvious the

15

Oklahoma evidence tended to prove the kidnapping offense's element, i.e., that Garcia-Garcia's purpose was to facilitate his flight from "endangering another while eluding an officer." Pales' and Neill's testimony described the high-speed chase, the shooting, and the resulting injury and crash. And even if Garcia-Garcia was unaware the shooting had a specific result, the testimony was relevant. We hold a reasonable person would have taken the same view adopted by the trial court. There was no abuse of discretion. See *Gonzalez*, 307 Kan. at 593.

Finally, we determine in step three if the district court abused its discretion by concluding the Oklahoma evidence's probative value outweighed its potential for undue prejudice. See *Haygood*, 308 Kan. at 1393. As mentioned, Garcia-Garcia claims the evidence would improperly lead the jury to believe he tried to kill Grimes because he was previously involved with injuring a law enforcement officer.

We hold that a reasonable person could conclude the challenged evidence, while adverse to Garcia-Garcia's defense, was not unduly prejudicial. Its overall probative value appears significant because "[i]t helped explain to the jury what might otherwise have seemed inexplicable." *Haygood*, 308 Kan. at 1396. And to some extent, it favored Garcia-Garcia because it mostly excluded him as a potential shooter in Oklahoma. Pales testified the gunshot that struck his windshield came from a rear window—not the driver's window. He also noted Garcia-Garcia could not fire through a rear window while driving at a high speed.

Finally, after admitting the evidence, the district court provided a limiting instruction, as required by law, telling the jury the specific purposes for which the evidence was admitted. See *State v. Richard*, 300 Kan. 715, 721, 333 P.3d 179 (2014). We hold the district court did not abuse its discretion. See *Gonzalez*, 307 Kan. at 593.

16

On appeal, Garcia-Garcia claims the prosecutor erred in making improper comments twice during trial. First, he claims in voir dire the prosecutor defined the reasonable doubt standard as requiring the jury to conduct a two-part test of finding doubt and then assessing if that doubt was reasonable. Second, he asserts the prosecutor erred in closing by using an inflammatory and speculative argument that Garcia-Garcia should have shot Cesar to prevent the later events.

*Additional facts*

During voir dire, after reminding prospective jurors Garcia-Garcia was presumed innocent, the prosecutor discussed the State's burden of proving its case beyond a reasonable doubt. In doing so, he asked whether a prospective juror could have doubt, yet still find a defendant guilty, and then suggested the jury could find Garcia-Garcia guilty if it had doubt so long as that doubt was not reasonable:

> "[The prosecutor]: Okay. The fact is he is presumed innocent. It is my burden to put on evidence that proves beyond a reasonable doubt that he is guilty of the crimes charged. If I don't do that, the verdict is not guilty. If I do that, in your opinion, it's a guilty verdict.
>
> "Now, burden. What's the burden? . . . I have to put on evidence. The question is: What's the burden? Well, the burden is beyond a reasonable doubt.
>
> . . . .
>
> "[W]hen we say 'beyond a reasonable doubt,' it's not beyond all doubt. The question is: Could you have doubt and still find the Defendant guilty?

. . . .

"Do you agree that doubt just cannot be reasonable? Does that make sense?"

At that point, the prospective juror asked for clarification. And in rephrasing, the prosecutor said "the standard beyond a reasonable doubt is kind of a two-part test. First you have to determine if you have any doubt . . . . And then you have to determine if that doubt is reasonable." Before moving to a different topic, the prosecutor also noted neither he nor defense counsel could define beyond a reasonable doubt for the jury and said the court would give the appropriate definition.

Next, in closing, defense counsel argued Garcia-Garcia's "motive was to flee, not to kill, not to [kidnap], not to burglarize. . . . Desperation to flee, but not to murder and kidnap." In rebuttal, the prosecutor responded that Garcia-Garcia had choices and his failure to invoke those choices showed his motive and intent to commit the charged offenses.

"[Garcia-Garcia] had the opportunity to simply leave the scene, even after firing once [at Grimes.] If he just wanted to scare him, shoot in the air four times. Did he shoot in the air four times? No. He didn't . . . .

" . . . He shoots in the direction of Deputy Grimes every single time.

. . . .

" . . . There's no doubt in his desperation he wanted to flee, but he was willing to do anything to do that.

"[A]s soon as he heard shots coming to Oklahoma . . . , [h]e didn't pull the vehicle over and stop and go, 'Hey, I want no part of this.' He didn't do that.

18

"When he heard Cesar saying, 'I'm shooting at officers,' and he hears the bullets and Cesar gives him the gun, *he doesn't shoot Cesar* and pull over and go Hey, I'm done. He doesn't do that.

"No, he continues into Kansas. He gets out. He runs. He kidnaps someone. He goes to another scene, gets another individual to give him a ride. He was willing to do anything to get away, including trying to kill Deputy Michael Grimes." (Emphasis added.)

*Standard of review*

The now familiar two-step analysis for reviewing prosecutorial error claims from *State v. Sherman*, 305 Kan. 88, 378 P.3d 1060 (2016), provides:

"[The] two steps can and should be simply described as error and prejudice. To determine whether prosecutorial error has occurred, the appellate court must decide [1] whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine [2] whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman*. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]" 305 Kan. at 109.

19

*Discussion*

An effort to define reasonable doubt is error when it leads to misstating law. For instance, in *State v. Banks*, 260 Kan. 918, 927 P.2d 456 (1996), the prosecutor remarked: "'Reasonable doubt means if you are going to say these men are not guilty of something, you have to give a reason for it.'" *Banks*, 260 Kan. at 926. This was error because it improperly implied the jury must find the defendant guilty unless it could articulate a reason for finding not guilty. 260 Kan. at 927; see also *State v. Walker*, 276 Kan. 939, 955-56, 80 P.3d 1132 (2003) (The district court erred instructing the jury "'that a reasonable doubt is just what the words themselves imply—a doubt founded on reason. *It is such a doubt as a juror is able to give a reason for.*'") (citing *Banks*, 260 Kan. at 927). And in *State v. Mitchell*, 269 Kan. 349, 7 P.3d 1135 (2000), the prosecutor in closing argument defined reasonable doubt as "'common sense.'" 269 Kan. at 359. This was improper because, by giving such a definition, the prosecutor tried to lower the State's burden. 269 Kan. at 360-61.

But an effort to explain a reasonable doubt is not error when it conforms to the acceptable reasonable doubt definition. It has been long held that "a jury instruction defining reasonable doubt is unnecessary," but it is true that "such an instruction is not erroneous where the instruction is restatement of judicially approved definitions." *Banks*, 260 Kan. at 927. For example, in *State v. Wilson*, 281 Kan. 277, 130 P.3d 48 (2006), the court noted: "Essentially, the prosecutor was saying that, although reasonable doubt does not have a precise definition, jurors will instinctively know it when they see it." 281 Kan. at 286. The defendant contested the prosecutor improperly equated reasonable doubt with mere intuition. The *Wilson* court disagreed because the prosecutor's statement properly explained the law on reasonable doubt by noting: "'"[N]o definition or explanation can make any clearer what is meant by the phrase 'reasonable doubt' than that which is imparted by the words themselves."'" 281 Kan. at 287 (quoting *Walker*, 276 Kan. at 956).

20

In Garcia-Garcia's case, the prosecutor explained the reasonable doubt standard was "kind of a two-part test" because the jury must determine, first, if there was any doubt, and, second, whether that doubt was reasonable. There is no caselaw explicitly approving this two-part-test concept as an acceptable way to describe reasonable doubt. But the real question is whether this altered or lowered the State's burden and misstated law. In *State v. Crawford*, 300 Kan. 740, 753, 334 P.3d 311 (2014), the court warned that an effort to define reasonable doubt often lowers the State's burden, leads the jury into ""a hopeless thicket of redundant phrases and legalese,"" and obscures its obligations rather than helps it in discharging its duty.

We hold there was no error. The steps the prosecutor described merely echoed the State's burden, like the comment in *Wilson*. And unlike the erroneous statements in *Walker* and *Mitchell*, the prosecutor's comment did not alter or lower the State's burden. Our conclusion is reinforced by the prosecutor's statements immediately following the complained-of remark that correctly characterized the State's burden and emphasized the prosecutor could not define it for the jury.

Turning to Garcia-Garcia's other challenge concerning the prosecutor's closing-argument contention that there was a choice to shoot Cesar, the State has some obvious problems that cause us to consider it outside the wide latitude afforded to prosecutors. The statement suggested Garcia-Garcia had a duty to act in defense of the officers when none existed. In *State v. Adams*, 292 Kan. 60, 73, 253 P.3d 5 (2011), the prosecutor argued, "'*This sure as heck would have been a different situation if the defendant had just walked away. He could have gone to the bouncers, he could have run to the parking garage*.'" The court held the statement was error because it "implied a duty to retreat, and such an implication was contrary to the judge's instruction to the jury" that the defendant had no duty to retreat. 292 Kan. at 74. In Garcia-Garcia's case, the prosecutor did not

21

limit his comments. He went on to say additional violence of uncertain legality under the circumstances would have solved Garcia-Garcia's problems.

Prosecutorial error is harmless if there is no reasonable possibility it contributed to the verdict. *Sherman*, 305 Kan. at 109. To be sure, the comment was odd, but it was made in passing and not repeated or emphasized. And the district court properly instructed the jury that counsel's statements, argument, and remarks were intended to help it understand the evidence and apply the law, and if any statements were unsupported by evidence admitted at trial, the court directed the jury to disregard them. It further properly instructed the jury to consider the elements the State would have to prove beyond a reasonable doubt to convict Garcia-Garcia as charged. Finally, there was strong evidence supporting his convictions. We hold the error was harmless.

## LESSER INCLUDED OFFENSE INSTRUCTIONS

The jury convicted Garcia-Garcia of kidnapping by confining Shafer by threat to facilitate flight from Oklahoma authorities. Garcia-Garcia requested an instruction on criminal restraint as a lesser included offense, which was given. But the district court did not instruct on the lesser included crime of attempted kidnapping. Now on appeal, Garcia-Garcia claims the jury would have reached a different verdict had it been instructed on attempted kidnapping because overwhelming evidence showed he tried to kidnap Shafer but failed because Shafer escaped. We see no error.

*Additional facts*

As Garcia-Garcia's vehicle approached the state line, it passed over stop strips, partially deflating the tires. An officer saw three people get out. In his police interview,

Garcia-Garcia said Cesar handed him a .40 caliber handgun while they were still in the vehicle and told him to take it. After the three abandoned the vehicle, they separated.

That evening, Shafer was outside his house where he lived with his fiancée, Shanna Thompson, and her mother. He was standing by his truck with Shanna when he saw Garcia-Garcia approaching. Garcia-Garcia asked for some water. Shafer had Shanna go inside the house. While she was gone, Garcia-Garcia asked Shafer if he could get a ride. Shafer thought this meant a ride to a gas station. Shafer at first refused. When the mother came out with water, Garcia-Garcia asked her for a ride and she volunteered Shafer to do it.

Shafer got in the truck planning to take Garcia-Garcia to a nearby gas station. While they drove, Garcia-Garcia tried to speak Spanish, which Shafer did not understand. As they approached the station, Shafer heard Garcia-Garcia saying, "No, no, no," and something about a highway. Shafer thought he meant a 7-Eleven station by the highway.

As he was driving, Shafer saw Garcia-Garcia had his hand on a gun, which was sitting on the console and pointed in his direction. While stopped at a stoplight, Garcia-Garcia started acting like he wanted him to go. When the light turned green, Garcia-Garcia shook the gun "a little bit telling [him] where to go." Shafer testified he was scared and believed he had no choice. Shafer wanted to stop at the closer station and be done, but he was not allowed to do that. When cross-examined, Shafer noted Garcia-Garcia never held the gun against his head or said he would shoot him.

Shafer continued driving to the station on the highway, hoping Garcia-Garcia would get out. On the way, Garcia-Garcia told him to take him to Garnett. Shafer refused, telling Garcia-Garcia he would go to a nearby bridge, drop him, and then go back home. Garcia-Garcia shook his gun, saying Shafer would take him.

23

During a police interview, Garcia-Garcia said he showed Shafer the gun, told him he was not a bad guy and just wanted to get back to his family, and asked to be taken a little further. He said Shafer expressed fear. When asked specifically if he threatened the driver with the gun, Garcia-Garcia nodded, saying, "'[Y]es,'" and noted again, "I just wanted to go—to try to coerce [him] to take me a little farther."

Around this time, Shafer saw a friend fishing at the bridge. Shafer stopped, got out of the truck, and talked to the friend about what was going on. Shafer testified he could not stop earlier because he believed he "probably would have got shot." His friend's presence made Shafer believe it was safe to stop. Shafer's episode with Garcia-Garcia ended when he thwarted Garcia-Garcia's attempt to steal his truck and Garcia-Garcia left the bridge with passer-by Henderson.

*Standard of review*

We must first determine whether the alleged instruction error occurred, which requires us to consider if the instruction was legally and factually appropriate. In doing this, we exercise unlimited review. If there is error, we must conduct a reversibility inquiry depending on whether the issue was properly preserved. Here, because Garcia-Garcia did not request the instruction for attempted kidnapping, we apply the clear error standard. K.S.A. 2017 Supp. 22-3414(3). The question then is whether we are firmly convinced the jury would have reached a different verdict if the instruction had been given. Garcia-Garcia has the burden to establish reversibility, and in assessing whether he meets his burden, this court makes a de novo decision based on the entire record. *State v. Williams*, 308 Kan. 1439, 1451, 430 P.3d 448 (2018).

*Discussion*

Whether attempted kidnapping was a lesser included crime of kidnapping is easily resolved because an attempt to commit a crime charged is a lesser included crime. K.S.A. 2017 Supp. 21-5109(b)(3). The real question is whether the instruction was factually appropriate. A lesser included offense instruction must be provided when there is some evidence, viewed in a light most favorable to the defendant, that would reasonably justify the defendant's conviction for a lesser included crime. *State v. Seba*, 305 Kan. 185, 204, 380 P.3d 209 (2016). Garcia-Garcia claims overwhelming evidence supported an attempted kidnapping conviction.

K.S.A. 2017 Supp. 21-5301(a) defines "attempt" as "any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing such crime." Garcia-Garcia claims the evidence shows he tried to kidnap Shafer but failed. In his view, Shafer "stopped the encounter and got out of his truck, at the location he said he would stop the encounter." As a result, he insists the trial court erred by failing to give the instruction. He also notes the jury had only two options of either acquittal or convicting him of kidnapping and argues, if the jury had been instructed properly, it would have reached a different verdict, i.e., the failure to give the instruction was clear error.

This is unconvincing. If true, any time a kidnapping victim escapes it becomes an attempted kidnapping. But that is not our caselaw. Shafer testified he was scared while at the red light and had no choice to stop the car, get out, and leave. He said he did not get out before seeing his friend "[b]ecause I think if I would have stopped, I probably would have got shot." By showing the gun, Garcia-Garcia gained sufficient control over Shafer to complete the crime of kidnapping. We hold the lesser included offense of attempted kidnapping was not factually appropriate.

25

BIDS FEES ASSESSMENT

Garcia-Garcia argues the district court violated statutory requirements when it imposed BIDS fees as a percentage without knowing what the total amount was. The State does not dispute this and merely argues this court "shall disregard all mere technical errors and irregularities which do not affirmatively appear to have prejudicially affected the substantial rights of the party complaining." The State also makes a preservation argument.

*Additional facts*

At sentencing, the district court ordered a 70 percent waiver of Garcia-Garcia's attorney fees because of the long prison sentence, without knowing the exact amount. The following colloquy occurred:

"The Court: . . . I know you'll probably have your fee, Mr. Lampson[, defense counsel at sentencing,] but I don't know about Mr. Wicks and Mr. Manna[, defense counsel at trial].

"Mr. Lampson: I don't know about theirs, Your Honor. My time would be three hours on the sentencing so, roughly, $200, Your Honor.

"The Court: All right. We'll order $200 of the fee at the BIDS' rate for Mr. Lampson's recommendation. As to Mr. Wicks and Mr. Manna, the Court will take that under advisement if we can get that information compiled as to what their fees would be listed as, or what they're requesting as far as BIDS.

"[The prosecutor]: Judge, do you want to take under consideration his ability to pay first, or do you want to—

26

"Mr. Lampson: We would ask the Court to consider waiving some of those attorney fees, Your Honor. It's very likely under the sentence, he's going to be incarcerated for quite some time.

"The Court: Before I waive a portion or all of the attorney fees I would like to know exactly what our number is.

"[The prosecutor]: Okay.

"The Court: It's very likely that I will waive a portion of that, but I don't just want to say we're going to waive whatever the fees were previous to Mr. Lampson being appointed without knowing what that is.

"[The prosecutor]: . . . Judge, may we approach?

"The Court: Yes.

"(Off the record bench conference.)

"The Court: As far as the attorneys' fee, what the journal entry will state, we can get the number, but . . . Mr. Garcia-Garcia is going to be incarcerated for a long period of time. I'm going to waive 70 percent of the Court-appointed attorney fee, the combined fee of Mr. Lampson, and then the previous attorneys that represented Mr. Garcia-Garcia. So whatever that number is determined to be that can be put on the journal entry as far as the total minus that portion that's been waived.

"[The prosecutor]: So it will be—just so I'm clear, it will be the $200 that's owed for Mr. Lampson's representation plus 30 percent of whatever is owed for the previous representation, or you're waiving 70 percent of—

"The Court: The entire.

"[The prosecutor]: Gotcha. Okay.

27

"The Court: Correct. Like I say, that's the best way I can determine to do it, not—not continuing and having a further hearing with those numbers. I would rather get this taken care of today and, I believe all the parties would appreciate that as well."

The journal entry reflected $2,850 for BIDS attorney fees.

*Standard of review*

Resolving a challenge to a district court's compliance with K.S.A. 22-4513 requires statutory interpretation, a question of law over which this court exercises unlimited review. *State v. Drayton*, 285 Kan. 689, 714, 175 P.3d 861 (2008).

*Discussion*

To begin with, the State argues this issue is not properly preserved. Generally, issues not presented to the district court will not be considered for the first time on appeal, but "because the statute places mandatory duties upon the district court, consideration is necessary to serve the ends of justice." *State v. Stevens*, 285 Kan. 307, 330, 172 P.3d 570 (2007), *overruled on other grounds by State v. Ahrens*, 296 Kan. 151, 290 P.3d 629 (2012); see also *State v. Robinson*, 281 Kan. 538, 541, 132 P.3d 934 (2006) (reviewed an unpreserved BIDS fees issue because it involved only a question of law arising on proved or admitted facts and was finally determinative of the case).

The State also asserts the issue is premature because Garcia-Garcia "has not been ordered to make monthly payments toward the BIDS fee as a condition of his incarceration" and because the statute allows him to petition the district court at any time to waive payment of all or part of the fees. But in *Robinson*, the State advanced the same argument to no avail. The *Robinson* court held the procedure was permissive and did not

28

rule out the possibility for an appeal. *Robinson*, 281 Kan. at 541; see also 281 Kan. at 544 ("[T]he fact that the statute also permits a defendant to petition for waiver does not change the mandatory language or mean the waiver procedure is intended as a substitute for the sentencing court's initial consideration of a defendant's finances."). We conclude we may review the newly raised BIDS matter.

The statute provides,

"(a) If the defendant is convicted, all expenditures made by the state board of indigents' defense services to provide counsel and other defense services to such defendant or the amount allowed by the board of indigents' defense reimbursement tables . . . , whichever is less, shall be taxed against the defendant and shall be enforced as judgments for payment of money in civil cases.

"(b) In determining the amount and method of payment of such sum, *the court shall take account of the financial resources of the defendant and the nature of the burden that payment of such sum will impose*. A defendant who has been required to pay such sum and who is not willfully in default in the payment thereof may at any time petition the court which sentenced the defendant to waive payment of such sum or of any unpaid portion thereof. If it appears to the satisfaction of the court that payment of the amount due will impose manifest hardship on the defendant or the defendant's immediate family, the court may waive payment of all or part of the amount due or modify the method of payment." (Emphasis added.) K.S.A. 22-4513.

The *Robinson* court made clear the statute imposes a mandatory duty on the trial court to tax BIDS fees against a defendant and explained how to do it:

"[T]he statute's first two subsections set out four distinct—but logically and temporally related—provisions: (1) BIDS must be reimbursed, and fees to enable such reimbursement must be assessed against convicted defendants and enforced as civil judgments; (2) the sentencing court shall consider the defendant's financial circumstances

29

in setting the amount and payment method of the fees; (3) once the fees are assessed, a defendant may petition for waiver of all or part of the fees; and (4) if such a petition is filed, the court will determine whether payment imposes 'manifest hardship' on the defendant and his or her family and, if so, may waive or modify the amount or method of payment." 281 Kan. at 544.

As for step two, the *Robinson* court noted the statute requires a sentencing court in assessing BIDS fees to consider *on the record* at the time of assessment the defendant's financial resources and "*the nature of the burden that payment of such sum will impose*." (Emphasis added.) 281 Kan. at 543; see *Stevens*, 285 Kan. at 329-30.

The sentencing court ordered Garcia-Garcia to pay 30 percent of the attorney fees without knowing how much they were. The court did not fulfill its statutory duty to consider his financial resources and the burden created by the attorney fees before granting a partial waiver. The failure explicitly to consider these two factors is reversible error. See *Drayton*, 285 Kan. at 716-18 (reversed the district court's order to reimburse BIDS for attorney fees in the amount of $7,110, when it essentially found the defendant would not have the financial ability to pay because he would be imprisoned for 25 years); *Stevens*, 285 Kan. at 327-31 (reversing the district court's order to pay attorney fees to BIDS before considering the defendant's financial condition); *Robinson*, 281 Kan. at 548 (reversing the court's order to pay attorney fees to BIDS without explicitly considering the defendant's financial resources and the burden that the payment would impose).

We affirm Garcia-Garcia's convictions. We vacate the attorney fees assessment and remand the case for reconsideration of Garcia-Garcia's obligation.