NOT DESIGNATED FOR PUBLICATION

No. 119,346

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

LEONARD D. CHARLES SR.,
*Appellant*.


MEMORANDUM OPINION

Appeal from Sedgwick District Court; JOHN J. KISNER JR., judge. Opinion filed July 19, 2019.
Affirmed.

*Peter Maharry*, of Kansas Appellate Defender Office, for appellant.

*Lance J. Gillett*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*,
attorney general, for appellee.

Before LEBEN, P.J., MALONE and GARDNER, JJ.


PER CURIAM: Leonard D. Charles appeals his convictions of one count of
aggravated kidnapping, one count of aggravated domestic battery, one count of criminal
threat, and two counts of domestic battery. Charles claims: (1) the State committed
reversible prosecutorial error in closing argument; (2) there was insufficient evidence to
support his aggravated kidnapping conviction; (3) the district court erred on the verdict
form by placing "guilty" before "not guilty," violating the presumption of innocence; (4)
the jury instructions infringed on the jury's power of nullification; and (5) cumulative
error requires reversal of his convictions. The State challenges our jurisdiction over this

1

appeal based on an insufficient notice of appeal. We find that the State has failed to show any prejudice based on Charles' deficient notice of appeal. But we find against Charles on each of his claims of error, so we affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Charles and R.C. had been involved in a romantic relationship for five years and planned to get married in the future. In August and September 2017, R.C. noticed a change in Charles' behavior. Charles became aggressive and egotistical. He began staying up for days at a time and neglecting his hygiene. During this time, Charles began several projects around the house, tearing things up and leaving projects unfinished. R.C. tried to talk to Charles about his behavior many times, but he denied having a problem and told her that "he needed to show the world that he wasn't going to take its crap anymore." In early September 2017, R.C. sent her 14-year-old son to live with his adult sister because R.C. feared for his safety because of Charles' aggressive behavior.

On September 17, 2017, R.C. had been away from the house running errands. When she returned home in the afternoon, she found the house in disarray. Charles was hanging up flags in a window. R.C. complained to Charles about the mess. In response, Charles got in R.C.'s face, "kind of headbutted [R.C.]," pointed his finger at her, and called her "a stupid bitch." This was the first time that Charles had ever physically attacked her. Charles followed R.C. to the bathroom and kept yelling and screaming at her. R.C. told Charles that he should just leave and she went outside to smoke.

Charles followed R.C. outside, and he swung the screen door open with enough force that the door hit R.C. Charles got in R.C.'s face and kept yelling and screaming at her to the point that he was "kind of spitting on [her]." Charles told R.C. that he was tired of her complaints and he could do what he wanted to do. Charles then grabbed R.C. by the hair and slammed her to the ground. Charles began to kick and hit R.C. while she was

2

on the ground. R.C. said she was in shock and did not understand why this was happening. As R.C. tried to get up off the ground, Charles grabbed her hair and drug her back into the house as she screamed.

Back in the house, Charles slammed R.C. to the floor and locked both locks on the door. As Charles began to shut the windows, R.C. went to the door and tried to unlock the locks. Charles pulled R.C. away from the door and slammed her down again. R.C. then tried to escape through the bedroom, which had a back door. Charles again caught up with her, grabbed her, and slammed her against a mattress that was leaning up against the wall, causing the mattress to fall on her. Charles lifted the mattress off R.C., grabbed R.C. by her hair, pulled her head back, and started to choke her. As he was choking her, Charles told R.C. that he could kill her with his hands.

Charles left R.C. in the bedroom. R.C. could hear Charles in the living room shutting windows, so she got up and ran for the back door in the bedroom. Before R.C. could get the slide lock open, Charles returned to the bedroom. He grabbed R.C. with both hands and squeezed her neck. R.C. tried to pull Charles' hands off her neck, but she passed out. As R.C. regained consciousness, Charles told her: "[Y]ou can die. If I'm jumping off a cliff, you can go with me." This pattern of choking R.C. until she passed out, waiting for her to wake up, and then choking her again happened five or six times.

When Charles left the room, R.C. went down the hallway to try to get to the front door. As soon as she made it into the living room, Charles came running up behind her with a golf club. Charles told R.C. to take the golf club and "beat my ass" and "[s]how me how bad you are." R.C. did not take the golf club but again began to run away. Charles hit her in the upper right side of her back with the golf club, knocking her to the floor. Charles grabbed R.C. by the hair and pulled her neck so far back that it "literally felt like it was going to snap at any time."

R.C. begged Charles to allow her to leave, but Charles said: "[Y]ou can't go anywhere now, not go looking like that. You look like the elephant man." Charles made R.C. take off her shirt because it was torn and had blood on it. Charles then poured a bottle of alcohol and a bottle of peroxide on her face before rubbing antibacterial cream on her. R.C. could taste the alcohol and her face burned as Charles poured the liquids on her. Charles also placed a towel with ice on her face. R.C. estimated that he held her in the house for a couple of hours before she finally talked him into letting her go across the street to get a Pepsi. Charles warned R.C. not to call the police.

Once outside, R.C. walked to a nearby Dollar General and called 911. R.C. also called a friend, Anette Hunt, who arrived at the Dollar General before the police. R.C.'s daughter and her daughter's boyfriend came and parked their car in front of R.C.'s house and waited for the police to arrive. About an hour later, after two additional calls to 911, the police arrived at the Dollar General.

Officer Juan Atondo responded to the Dollar General. Atondo took a statement from R.C. and took photographs of her injuries. He testified that R.C. had several scratches on her face and a "huge goose egg" on her forehead. R.C. also had red marks along her neck and cheek. Atondo believed he could see petechial hemorrhages in R.C.'s eyes consistent with being choked. Atondo said that R.C. looked like she had been in a car accident. EMS attended to R.C., but she declined to go to the hospital. Instead, she walked back to her house with the police.

By that time, Charles had left and other police officers had cleared the house. R.C. took Hannah Holley, a crime scene investigator, through the house and pointed out things that had changed since she was able to leave. Holley noted that the entire house smelled like cleaning solution. Holley located a single golf club in the bedroom. Holley collected various items from the house as evidence. In Holley's presence, R.C. undressed so that Holley could document her injuries. R.C. sustained large bruises and scrapes all over her

4

body, a contusion on her head, bruising and scratching to her neck, bruising to her arms, bruising up and down her back, a blood clot under her chin, a concussion, and whiplash.

On September 20, 2017, the State charged Charles with aggravated battery, aggravated domestic battery, and criminal threat. The State later filed an amended information to include a charge of aggravated kidnapping and another charge of aggravated battery.

At trial, R.C., Hunt, Holley, Atondo, and other law enforcement officers testified for the State. The State introduced over 100 photographs showing R.C.'s injuries and the condition of her residence on September 17, 2017. Charles testified in his defense. He denied having an argument with R.C. and denied hitting or kicking her. He claimed that R.C. fell off the porch and when he went to help her, R.C. told him to get off of her. Charles testified that R.C. was taking medications that made her tend to exaggerate.

The district court instructed the jury on all five charges as well as the lesser included offenses. The jury found Charles guilty of one count of aggravated kidnapping, one count of aggravated domestic battery, one count of criminal threat, and two counts of domestic battery.

Before sentencing, Charles filed a motion for appointment of new counsel, which the district court denied. Charles then chose to represent himself at the sentencing hearing. The district court sentenced him to a controlling term of 638 months in prison.

Charles filed a timely pro se notice of appeal.

5

The State claims that this court lacks jurisdiction over the appeal because Charles' notice of appeal is insufficient to confer appellate jurisdiction. Whether jurisdiction exists is a question of law over which an appellate court has unlimited review. *State v. Smith*, 304 Kan. 916, 919, 377 P.3d 414 (2016).

K.S.A. 2018 Supp. 60-2103(b) provides:  "The notice of appeal shall specify the parties taking the appeal; shall designate the judgment or part thereof appealed from, and shall name the appellate court to which the appeal is taken." In addition, Supreme Court Rule 2.02 (2019 Kan. S. Ct. R. 14) states that the "notice of appeal must be filed in the district court, be under the caption of the district court case, and be in substantial compliance with the judicial council form."

After sentencing, and within the 14 days required to file a notice of appeal, Charles filed a pro se document entitled "Pro se Motion for 'NOTICE OF APPEAL.'" The notice of appeal identifies the correct criminal case as 2017 CR 2787. But instead of identifying the order from which the appeal is taken, the remainder of the notice of appeal identifies trial errors below and reads much like a K.S.A. 60-1507 motion. Nowhere in the notice of appeal does Charles state that he is appealing from his convictions nor does he identify a date of conviction or sentencing. The notice of appeal also fails to identify the Court of Appeals as the appellate court to which the appeal is taken.

Generally, the appellate courts construe notices of appeal broadly to confer jurisdiction. In *State v. Laurel*, 299 Kan. 668, 673, 325 P.3d 1154 (2014), our Supreme Court noted that K.S.A. 2011 Supp. 60-2103(b) should be liberally construed to "'to assure justice in every proceeding.'" But the court also indicated there was a substantive minimum notice required by the statute to support jurisdiction. 299 Kan. at 673.

6

As noted by the State, Charles' notice of appeal violates K.S.A. 2018 Supp.60-2103(b), as it fails to designate the judgment appealed from or the appellate court to which the appeal is taken. But the notice of appeal is identified as a notice of appeal, it properly contains the caption of the district court case, and it is apparent from the substance of the document that he is challenging the circumstances that led to his convictions. Charles filed the notice of appeal within 14 days of his sentence.

In *Laurel*, our Supreme Court found that "a notice of appeal need not be overly technical or detailed," and the court focused on whether the State could show prejudice from the shortcomings in the notice of appeal. 299 Kan. at 674. Here, the State claims prejudice, but it fails to explain how it suffered prejudice. Instead, the State argues it "should not be required to demonstrate prejudice or surprise under circumstances showing no notice of appeal being filed."

There is no indication that the State has suffered any surprise or prejudice as a result of Charles' notice of appeal. Based on *Laurel*, we find that the notice of appeal was sufficient to convey notice that Charles was appealing his convictions. Thus, we conclude that this court has jurisdiction over Charles' appeal.

PROSECUTORIAL ERROR

Charles argues that the prosecutor committed reversible error in closing argument by appealing to the jury's sympathy for the victim, R.C. The State responds that the prosecutor was merely making fair comment on the evidence. The State also asserts that Charles cannot show prejudice resulting from any error in the closing argument.

In *State v. Sherman*, 305 Kan. 88, 378 P.3d 1060 (2016), the Kansas Supreme Court clarified that the appellate court uses a two-step process to evaluate claims of prosecutorial error:

7

"These two steps can and should be simply described as error and prejudice. To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801, (2011), *cert. denied* 565 U.S. 1221 (2012). We continue to acknowledge that the statutory harmlessness test also applies to prosecutorial error, but when 'analyzing both constitutional and nonconstitutional error, an appellate court need only address the higher standard of constitutional error.' [Citation omitted.]" 305 Kan. at 109.

Charles claims the State committed prosecutorial error in the closing argument by referring to the R.C.'s strength and to what she endured at the hands of Charles. The relevant part of the State's closing argument is as follows:

"I'm strong. Those were the words of the defendant yesterday to you. He was strong. So much so that he made his wife look like she had just been in a car accident, according to Officer Atondo. That's what he thought the first thing he saw her. But I would suggest to you that the evidence that you heard over the last couple of days was that the strong person was [R.C]. She was strong enough to be violently confined, threatened, beat for hours in her own home and not fight back. She had the strength to not do that. She had the strength to get away and the brain power to convince him to let her go get that Pepsi. She had the strength to call 911 on someone she loved and had known for a long time. She had the strength to tell that 911 operator what happened to her. She had the strength to tell Officer Atondo what happened to her. She had the strength to disrobe in front of a stranger and let her photograph her, while she pealed [*sic*] away her clothing to show the

injuries her husband had just put on her. And she had the strength to come in here and answer questions about what happened to her.

"So this is the time where you put the evidence that you hear, the words, the physical evidence to the law that the Judge gave to you. And the instructions tell you you're to use your common knowledge and experience. You get to use your common sense. And I ask you to do that."

Prosecutors are allowed wide latitude when delivering closing arguments. *State v. Pribble*, 304 Kan. 824, 832, 375 P.3d 966 (2016). Even so, a prosecutor's statements must be based on the evidence. *State v. Stimec*, 297 Kan. 126, 128, 298 P.3d 354 (2013). A prosecutor should refrain from making statements that "inflame the passions or prejudices of the jury or distract the jury from its duty to make decisions based on the evidence and the controlling law." *State v. Baker*, 281 Kan. 997, 1016, 135 P.3d 1098 (2006). A prosecutor should not seek to draw the jurors' attention away from the task of weighing the evidence and instead invite them to rely on underlying emotions. See *State v. Schumacher*, 298 Kan. 1059, 1073, 322 P.3d 1016 (2014).

Here, the prosecutor referred to R.C.'s strength and to what she had to endure during and after the physical altercation with Charles. Arguably the prosecutor's statements invoked sympathy for R.C. But on the other hand, the statements were based on evidence presented at the trial. Without deciding whether the statements amounted to prosecutorial error, we will proceed directly to the prejudice prong of the two-step process to evaluate the claim of prosecutorial error.

Prosecutorial error is harmless if the State can show "beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict." *Sherman*, 305 Kan. at 109. Here, even if the prosecutor's statements amounted to error, the State presented overwhelming evidence to the jury corroborating R.C.'s version of a prolonged attack leading to injuries to various parts of her body. This

9

evidence included the corroborating testimony from several witnesses, dozens of photographs, and video evidence. The evidence was inconsistent with Charles' account of a single fall from a shallow porch.

Moreover, the district court instructed the jury that "[s]tatements, arguments, and remarks of counsel are intended to help you in understanding the evidence and in applying the law, but they are not evidence. If any statements are made that are not supported by evidence, they should be disregarded." Jurors are presumed to follow the district court's instructions. *State v. Peppers*, 294 Kan. 377, 392, 276 P.3d 148 (2012). Finally, the fact that the jury found Charles guilty of two lesser included offenses shows that the jury was not influenced by emotions and sympathy but focused on the evidence.

In light of the entire record, we conclude there is no reasonable possibility that any prosecutorial error in closing argument contributed to the jury's verdict here. Charles fails to show any prejudice. As a result, the challenged comments were harmless beyond a reasonable doubt and do not require reversal.

SUFFICIENCY OF THE EVIDENCE TO SUPPORT AGGRAVATED KIDNAPPING

Next, Charles challenges the sufficiency of the evidence supporting his aggravated kidnapping conviction. The State charged Charles with aggravated kidnapping with the intent to hold R.C. to inflict bodily harm or to terrorize her. The State also charged Charles with criminal threat and three aggravated battery offenses. Relying on our Supreme Court's holding in *State v. Buggs*, 219 Kan. 203, 216, 547 P.2d 720 (1976), Charles contends the confinement was incidental to these offenses, and there was not a separate and distinct act supporting the aggravated kidnapping charge.

When a defendant challenges the sufficiency of the evidence in a criminal case, an appellate court reviews the evidence in a light most favorable to the State to determine

whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. *State v. Rosa*, 304 Kan. 429, 432-33, 371 P.3d 915 (2016). This court does not reweigh the evidence or assess the credibility of witnesses. *State v. Dunn*, 304 Kan. 773, 822, 375 P.3d 332 (2016).

The State charged Charles with aggravated kidnapping under K.S.A. 2017 Supp. 21-5408(a)(3), which requires confinement with the intent "to inflict bodily injury or to terrorize the victim or another." The district court instructed the jury consistent with the elements of the charged crime. See K.S.A. 2017 Supp. 21-5408(a)(3).

Charles argues that for an aggravated kidnapping conviction to stand, the kidnapping must be separate and distinct from the underlying crimes. "[A] kidnapping statute is not reasonably intended to cover movements and confinements which are slight and 'merely incidental' to the commission of an underlying lesser crime." *Buggs*, 219 Kan. at 215. In *Buggs*, the Kansas Supreme Court laid out a framework for determining whether the confinement was distinct enough from the other crimes to allow a separate charge of kidnapping. The movement or confinement:

> "(a) Must not be slight, inconsequential, and merely incidental to the other crime;
> "(b) Must not be of the kind inherent in the nature of the other crime; and
> "(c) Must have some significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection." 219 Kan. at 216.

But Charles' argument fails because the three-part *Buggs* test only applies to kidnapping with the intent to facilitate flight or commission of any crime in violation of K.S.A. 2017 Supp. 21-5408(a)(2). In *State v. Burden*, 275 Kan. 934, 943-44, 69 P.3d 1120 (2003), the Kansas Supreme Court held that the three-part *Buggs* test does not apply to kidnapping with the intent to inflict bodily injury or to terrorize the victim or another in violation of K.S.A. 2017 Supp. 21-5408(a)(3). Charles' argument based on *Buggs* fails

11

because the State charged him with aggravated kidnapping in violation of K.S.A. 2017 Supp. 21-5408(a)(3) and not K.S.A. 2017 Supp. 21-5408(a)(2).

Charles argues that *Burden* was wrongly decided because the Supreme Court failed to consider that charging aggravated kidnapping under K.S.A. 2017 Supp. 21-5408(a)(3) is similar in effect as charging a defendant under K.S.A. 2017 Supp. 21-5408(a)(2). But the Court of Appeals is duty bound to follow Kansas Supreme Court precedent, absent some indication the Supreme Court is departing from its previous position. *State v. Meyer*, 51 Kan. App. 2d 1066, 1072, 360 P.3d 467 (2015). There is no indication that the Supreme Court is departing from its precedent in *Burden*.

Removing the *Buggs* argument from consideration, we are left to decide whether the evidence presented at trial, viewed in a light most favorable to the State, supports Charles' conviction of aggravated kidnapping. Here, there is evidence of confinement. R.C. had removed herself from the verbal altercation with Charles and was sitting on the front porch smoking a cigarette. Charles sought R.C. out on the front porch, began a physical altercation, dragged her inside the house, and locked both of the locks to prevent her release. He also shut the windows of the house to prevent anyone from hearing her calls for help, and he prevented her from escaping out the back door. Every time R.C. tried to leave the house, Charles prevented her from doing so. The evidence is overwhelming that Charles committed these acts with the intent to inflict bodily injury on R.C. or to terrorize her. Finally, the evidence was overwhelming that Charles inflicted bodily harm upon R.C. Thus, the State presented sufficient evidence to support the jury's verdict that Charles was guilty beyond a reasonable doubt of aggravated kidnapping.

VERDICT FORM

Next, Charles argues that the district court violated his constitutional right to the presumption of innocence by placing the "guilty" option before the "not guilty" option on

12

the verdict form. During the jury instruction conference, Charles requested that the "not guilty" line on the verdict form be placed first, followed by the "guilty" line. The district court denied the request and provided a verdict form that listed the "guilty" line as the first option as provided in the Pattern Instructions of Kansas (PIK). The district court also provided a presumption of innocence instruction.

"While a verdict form is not technically a jury instruction, it is part of the packet sent with the jury which includes the instructions and assists the jury in reaching its verdict. It is appropriate to apply the same standard of review applicable to the review of instructions." *Unruh v. Purina Mills*, 289 Kan. 1185, 1197-98, 221 P.3d 1130 (2009).

> "When analyzing jury instruction issues, we follow a three-step process:
> '(1) determining whether the appellate court can or should review the issue, *i.e.*, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether error occurred below; and (3) assessing whether the error requires reversal, *i.e.*, whether the error can be deemed harmless.' [Citation omitted.]" *State v. McLinn*, 307 Kan. 307, 317, 409 P.3d 1 (2018).

Here, Charles objected to the verdict form in district court, so we can review his claim on appeal. But the district court did not err in using a verdict form with the "guilty" opinion before the "not guilty" option. In *State v. Wesson*, 247 Kan. 639, 652, 802 P.3d 574 (1990), *cert. denied* 501 U.S. 1236 (1991), *disapproved of on other grounds by State v. Rogers*, 282 Kan. 218, 144 P.3d 625 (2006), our Supreme Court held that the district court did not err by using a verdict form placing the "guilty" option before the "not guilty" option as long as the district court properly instructed the jury on the defendant's presumption of innocence. Here, the district court properly instructed the jury that it "must presume that [Charles] is not guilty unless you are convinced from the evidence that he is guilty." Based on our Supreme Court's holding in *Wesson*, we reject Charles'

13

claim that the district court used an erroneous verdict form. See also *State v. Wilkerson*, 278 Kan. 147, 158-59, 91 P.3d 1181 (2004).

## JURY NULLIFICATION

Next, Charles contends that several of the jury instructions were clearly erroneous because the instructions failed to preserve the jury's power of nullification. Charles presents two complaints. First, he contends the district court erred by instructing the jury that it could only consider the lesser included offenses if it could not agree on guilt for the crime charged. Second, Charles argues the district court erred by instructing the jury that it "must" follow the law and it was the jury's "duty" to do so.

We have already set forth the three-step standard of review when analyzing jury instruction issues. *McLinn*, 307 Kan. at 317. If there was no objection to the complained-of instruction, this court applies the clearly erroneous standard for reversal. K.S.A. 2017 Supp. 22-3414(3); *State v. Williams*, 295 Kan. 506, Syl. ¶ 3, 286 P.3d 195 (2012).

Jury nullification is

> "'[a] jury's knowing and deliberate rejection of the evidence or refusal to apply the law
> either because the jury wants to send a message about some social issue that is larger than
> the case itself or because the result dictated by law is contrary to the jury's sense of
> justice, morality, or fairness.' Black's Law Dictionary 875 (8th ed. 2004)." *Silvers v.*
> *State*, 38 Kan. App. 2d 886, 888, 173 P.3d 1167, *rev. denied* 286 Kan. 1180 (2008).

See *State v. McClanahan*, 212 Kan. 208, 213, 510 P.2d 153 (1973).

*Sequential consideration of lesser included offenses*

The district court instructed the jury on several lesser included offenses. As part of the instructions, the district court informed the jury that it could only consider the lesser included offenses if it did not agree that the defendant was guilty of the greater offense. Charles complains that requiring the jury to consider the offenses sequentially coerced it to find him guilty of the more serious charge and violated its power of nullification.

In *State v. Smith*, No. 117,423, 2018 WL 6712629, at *7 (Kan. App. 2018) (unpublished opinion), *petition for rev. filed* January 16, 2019, this court rejected a similar argument, finding "[s]equential consideration of lesser included offenses is legally appropriate." Relying on *State v. Parker*, 301 Kan. 556, 561, 344 P.3d 363 (2015), and *State v. Trujillo*, 225 Kan. 320, 324, 590 P.2d 1027 (1979), this court found that instructing the jury to consider the lesser offenses sequentially and in descending order of severity is an orderly method of consideration and does not coerce the jury into returning a guilty verdict for the more severe charge. *Smith*, 2018 WL 6712629, at *7.

Although this court's decision in *Smith* is not final, we adopt the reasoning in that case and reject Charles' claim that the district court erred by instructing the jury to consider the lesser included offenses sequentially. We point out that Charles' jury found him guilty of two lesser included offenses of domestic battery, so clearly the jury was not coerced to find him guilty of the more serious charge on those counts.

*Jury "must" follow the law and had a "duty" to do so.*

Next, Charles asserts the district court erred by instructing the jury that it "must" follow the law and it was the jury's "duty" to do so. He complains this language improperly compelled the jury to find him guilty rather than giving the jury the option of exercising its power of nullification.

15

In Instruction No. 1, the district court instructed the jury that it was the jury's "duty to consider and follow all of the instructions." Instruction No. 11 provided: "Your verdict must be founded entirely upon the evidence admitted and the law as given in these instructions."

The State argues this issue should not be considered because of invited error. Under the invited error doctrine, a defendant cannot challenge an instruction on appeal, even as clearly erroneous under K.S.A. 2017 Supp. 22-3414(3), when there has been an on-the-record agreement to the wording of the instruction at trial. *State v. Stewart*, 306 Kan. 237, 248-49, 393 P.3d 1031 (2017). Here, Charles invited any error on Instruction No. 1 as he specifically requested the identical language. He also did not object to this instruction during the jury instruction conference. Charles also specifically requested the identical jury instruction as provided in Instruction No. 11, and he did not object to this instruction during the jury instruction conference. Thus, Charles is precluded from relief based on invited error. 306 Kan. at 248-49. In any event, Kansas appellate courts have approved of jury instructions with similar language, finding that a jury instruction directing the jury to follow the law is not error. See *State v. Pennington*, 254 Kan. 757, 764, 869 P.2d 624 (1994); *McClanahan*, 212 Kan. 208, Syl. ¶ 3.

CUMULATIVE ERROR

Finally, Charles claims he was denied a fair trial based on cumulative error. See *State v. Santos-Vega*, 299 Kan. 11, 27-28, 321 P.3d 1 (2014). But the only possible error we have identified in this opinion is prosecutorial error by invoking sympathy for the victim in closing argument. A single error cannot support reversal under the cumulative error doctrine. *State v. Gonzales*, 307 Kan. 575, 598, 412 P.3d 968 (2018).

Affirmed.