NOT DESIGNATED FOR PUBLICATION

No. 127,533

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

DONALD GOLDSTEIN and INGRID GOLDSTEIN, CO-EXECUTORS of the
ESTATE OF MARK ALLAN GOLDSTEIN,
*Appellants*,

v.

TEXTRON AVIATION INC.,
*Appellee*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; JEFFREY GOERING, judge. Oral argument held April 8, 2025. Opinion filed January 30, 2026. Affirmed.

*Taylor P. Foye* and *Joseph A. Kronawitter*, of Horn Aylward & Bandy, LLC, of Kansas City, Missouri, and *Arthur Alan Wolk*, pro hac vice, of The Wolk Law Firm, of Philadelphia, Pennsylvania, for appellants.

*Matthew A. Spahn, Marcia A. Wood, Jeff C. Spahn,* and *Michael G. Jones*, of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of Wichita, for appellee.

Before WARNER, C.J., ATCHESON and ISHERWOOD, JJ.

WARNER, C.J.: This case arises out of an airplane crash in Wichita, where the pilot (the only person on board) was killed. The plane had been manufactured by the predecessor of Textron Aviation, Inc., in 2000 and was in the process of being sold and transported when one of the engines failed. The pilot's mother later sued several companies, including Textron, both on behalf of the pilot's estate and in her own

1

capacity. Many years of litigation followed, and the lawsuit against Textron went to jury trial in the fall of 2022, raising a single question: Was Textron responsible for wrongful death of the pilot? The jury ultimately found that Textron was not the proximate cause of the crash, and the district court entered judgment in favor of the defendant.

The pilot's mother now appeals, challenging several evidentiary rulings the district court rendered throughout the course of the trial. But after carefully reviewing the appellate record and the parties' arguments, we are not persuaded that the district court erred in admitting or excluding any of that evidence. We thus affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

The crash at the heart of this case involved a King Air B200 airplane manufactured by Textron in 2000. The King Air B200 was a six-seat, low-wing airplane with two engines—a right engine and a left engine. Each engine had a four-bladed propeller. It was also equipped with a rudder boost system and auto-feathering system to aid the pilot in the event of an engine failure.

*The crash*

In October 2014, Textron was in the process of selling this particular airplane to a buyer and hired Mark Allen Goldstein to pilot the airplane from Mid-Continent Airport in Wichita to Mena, Arkansas, where it was to be painted. In the week leading up to this flight, Textron's mechanics performed maintenance on the airplane so it would be ready for sale. This maintenance included several items, but only a few are relevant to this discussion:

- The mechanics performed work on both engines. Some of this work included a "hot section inspection," which requires various pneumatic and hydraulic lines to be disconnected, including one called the Py line.

- Textron performed a post-maintenance test flight and found that "[t]he left throttle lever was ahead of the right by about 1/4 of the lever knob" and the cabin environmental-pressurization system had a leak.

- Textron's mechanics performed additional maintenance, did a second test-flight, and found that "the throttle lever mismatch was corrected" and the "environmental system bleed air valves (flow packs) pressurization leak rates were acceptable, although one was weaker than the other when tested independently. No other anomalies were noted."

- The mechanics then swapped the left and right environmental flow packs to address those conditions.

On the morning of October 30, 2014, after receiving clearance from ground traffic control, Goldstein taxied the airplane down the runway and then lifted off into flight. Just seconds after takeoff, Goldstein could be heard on the cockpit voice recorder muttering "[f]uck." A few seconds later, Goldstein declared a state of emergency to air traffic control, stating that he just "lost the left engine." And few seconds after that, the airplane crashed into a nearby building. The airplane burst into flames, consuming most of the plane. In total, 26 seconds passed between lift-off and collision.

Goldstein died in the crash, along with three people who were in the building struck by the plane. Six others were injured but survived.

*The lawsuit*

In 2016, Ingrid Goldstein and Donald Goldstein, as co-executors of Goldstein's estate, filed a lawsuit against many defendants—including Beechcraft Corporation; Hawker Beechcraft Global Customer Support, LLC; and Beechcraft Holdings, LLC. (In 2017, these three entities merged into one entity—Textron.) Ingrid, who was Goldstein's mother, also brought wrongful-death claims against these defendants in her individual capacity.

While this lawsuit began with several parties and several claims, its scope was narrowed significantly throughout years of pretrial litigation. Most notably, the plaintiffs reached settlements with all defendants except Textron, and the district court granted summary judgment on the estate's remaining claim—a survival action. Thus, the only claim left when the case went to trial in 2022 was Ingrid's wrongful-death claim for the loss of her son.

A jury heard evidence on this claim over two weeks. The evidence admitted during this trial is largely the subject of this appeal, and we will discuss it in further detail as it relates to each issue. But we summarize the parties' key contentions to the jury here.

*The trial*

Ingrid claimed that Textron should be held responsible for the crash—and Goldstein's resulting death—due to the negligence of its mechanics who performed the maintenance in the days before the crash and also because it had not provided sufficient warnings to allow Goldstein to avert the crash when the plane's engine failed. More specifically:

- Ingrid alleged that Textron's mechanics had been negligent in their maintenance of the airplane, leading to a power loss on takeoff. In particular, she asserted that the mechanics had not performed a "required leak check" of the engines. And she asserted that a mechanic had cross-threaded a B-nut fitting when attaching the Py line, which left a leak in the engine.

- Ingrid alleged that Textron did not publish the velocity minimum control airspeed (commonly denoted "Vmca") "for an un-feathered and windmilling propeller" for this airplane and thus did not provide Goldstein warning about the speed at which he would no longer be able to control the airplane. Ingrid asserted that this lack of warning prevented Goldstein from being able to respond to the engine failure and ultimately caused the crash.

Textron denied these claims and contended that the sole cause of the accident was Goldstein's negligence. According to Textron, Goldstein had performed a "rushed and incomplete" pre-flight inspection of the airplane and had not inspected or set the friction locks on the plane's throttle levers, which resulted in the left throttle lever moving backwards during takeoff and causing the left engine to sputter. Textron also argued that once this emergency situation arose, Goldstein did not act as a reasonably competent pilot would by following an emergency checklist procedure. Textron alleged that these deficiencies included "not applying the correct control inputs to the airplane, applying incorrect inputs, failing to restore the power to the left engine, failing to raise the landing gear, failing to ensure that the left propeller was feathered[,] and failing to control the airplane." Textron contended that "Goldstein's failures and mistakes caused loss of control of the airplane and was the direct and sole cause of the accident and his death."

Textron argued that Goldstein had been taking medications for anxiety and had not disclosed that information to the Federal Aviation Administration (FAA)—a violation of that agency's regulations that otherwise would have prevented him from receiving a

pilot's license. According to Textron, Goldstein's anxiety caused him to react "unreasonably and inappropriately" when the emergency arose, likely contributing to his inability to conduct the emergency checklist procedure.

The jury heard all the evidence and returned a verdict in Textron's favor. Specifically, the jury found that Textron did not negligently maintain the airplane and that negligent maintenance by Textron was not a factual cause of the accident that resulted in Goldstein's death. The jury also found that although the warnings Textron provided were lacking in some respects, the inadequate warnings did not cause the accident that resulted in Goldstein's death.

Ingrid filed a motion for a new trial, arguing that several evidentiary rulings by the district court during the trial had been erroneous and required retrial. The district court denied this motion and entered judgment in favor of Textron.

Ingrid appeals. Textron also filed a notice of cross-appeal but later voluntarily dismissed it under Supreme Court Rule 5.04(a) (2025 Kan. S. Ct. R. at 32).

APPELLATE JURISDICTION

Before turning to Ingrid's various evidentiary challenges, we first consider an assertion by Textron relating to our authority to hear this appeal at all. Textron asserts that the notice of appeal in this case stated that the estate—not Ingrid, in her own capacity—was seeking review of the judgment. But the evidentiary challenges raised on appeal involve only rulings from the trial, where the sole issue presented was Ingrid's wrongful-death claim. Textron asserts that because Ingrid never filed a notice of appeal, we lack appellate jurisdiction over these claims.

6

It is true, as Textron notes, that the notice of appeal states this appeal is brought by "Plaintiffs Donald Goldstein and Ingrid Goldstein, co-executors of the Estate of Mark Allan Goldstein" and seeks review of the district court's denial of the motion for a new trial—a trial that only presented Ingrid's wrongful-death claim. The appellants' brief likewise refers to "Plaintiffs-Appellants Donald and Ingrid Goldstein, co-executors of the Estate of Mark Goldstein," but the substance of that brief relates entirely to Ingrid's wrongful-death claim.

Our review of the record in this case shows that this lack of detail is not new; the parties have been playing fast and loose with party designations, names, and case captions throughout the case. This lawsuit was filed by Ingrid Goldstein and Donald Goldstein, as co-executors of Goldstein's estate, but it asserted both wrongful-death and survival claims, and the parties throughout the case treated it as though it were brought by Ingrid both as a co-executor and individually. The district court later granted Textron summary judgment on the estate's survival action (a decision the estate has not challenged on appeal). The court also found that Donald could not assert a wrongful-death action because Donald was Goldstein's stepfather and had not formally adopted him. This left Ingrid as the only remaining plaintiff.

The case caption was never updated after the district court granted summary judgment as to the survival claim and those claims brought by Donald. And throughout the trial, much confusion existed between the parties and the court regarding whether the estate was still a plaintiff alongside Ingrid. Filings referred to both Ingrid (singular) and "plaintiffs" (plural). Near the end of trial while conferring on jury instructions, Textron indicated that wrongful-death claims can only be brought by a person's heirs-at-law, not the person's estate. The final jury instructions included a new simplified case caption that listed only "Ingrid Goldstein" as plaintiff. And the final verdict form signed by the presiding juror included the same caption.

7

Then after trial, the parties' case caption reverted to the original version, naming Donald and Ingrid as co-executors of the estate. This same wording appears on the notice of appeal.

Because Ingrid, as heir-at-law, was not specified as a party taking the appeal, and the estate cannot assert a wrongful-death claim, see *Mason v. Gerin Corp.*, 231 Kan. 718, 721, 647 P.2d 1340 (1982), Textron contends this appeal should be dismissed. Although Textron describes this argument as relating to subject-matter jurisdiction, the substance of that discussion rightly relates to our appellate jurisdiction—that is, our authority to hear the appeal in light of this procedural deficiency, not our authority to hear appeals from wrongful-death actions generally.

The right to appeal is purely statutory, and thus "appellate jurisdiction exists only if a party files an appeal in the manner prescribed by Kansas statutes." *Hernandez v. Pistotnik*, 60 Kan. App. 2d 393, 404, 494 P.3d 203 (2021). If the record shows that an appellate court does not have jurisdiction, it is the duty of the appellate court to dismiss the appeal. *In re Adoption of Baby Girl P.*, 291 Kan. 424, 429, 242 P.3d 1168 (2010).

The procedures for filing appeals in civil cases are largely contained in K.S.A. 60-2103. K.S.A. 2024 Supp. 60-2103(a) first defines the timeframes during which an appeal must be taken, requiring the appeal to be filed 30 days from the entry of judgment. The timely filing of a notice of appeal during these timeframes is jurisdictional; an untimely notice prevents an appellate court from having any authority to consider the case. *Board of Sedgwick County Comm'rs v. City of Park City*, 293 Kan. 107, 119, 260 P.3d 387 (2011). There is no question that the notice of appeal in this case was timely filed. Thus, we have appellate jurisdiction to hear the issues presented here.

After defining this jurisdictional timeframe, K.S.A. 60-2103 goes on to provide other procedures for taking an appeal. These range from defining the content for a notice

of appeal to establishing supersedeas bonds. But unlike the 30-day timeframe, these other procedural standards are not jurisdictional requirements. In fact, K.S.A. 2024 Supp. 60-2103(a) indicates that the "[f]ailure of the appellant to take any of the further steps [in the statute] to secure the review of the judgment appealed from does not affect the validity of the appeal."

One of these nonjurisdictional requirements is found in K.S.A. 60-2103(b), which sets forth the required components of a notice of appeal. That provision states that the notice of appeal "shall specify the parties taking the appeal." K.S.A. 2024 Supp. 60-2103(b). Ingrid acknowledges that the notice lists her in her capacity as the estate's executor, not as an heir bringing a wrongful-death claim. But she emphasizes that she is the only appellant in this case and asserts that Textron is seeking to dismiss the case on a technicality, rather than on its merits. She points out that Kansas appellate courts may generally excuse technical deficiencies in the notice of appeal as long as the appellant has substantially complied with K.S.A. 60-2103(b) and the appellee is not harmed. See *Pistotnik*, 60 Kan. App. 2d at 410-12.

We agree. Although the notice of appeal did not indicate with precision that it was Ingrid, in her individual capacity, who was appealing, it nevertheless substantially complied with the provisions of K.S.A. 60-2103. The notice listed the judgment being appealed with specificity—a judgment rendered against Ingrid pertaining to Ingrid's wrongful-death claim. Textron thus understood what the appeal would discuss. It also listed Ingrid, albeit in her capacity as executor, not individually. And it states the court to which the appeal will be taken. See K.S.A. 2024 Supp. 60-2103.

Perhaps most notably, Textron has pointed to no prejudice caused by the notice (other than responding to the appeal generally, which it would have done even if Ingrid had been listed individually on the notice). The record also shows that Textron has repeatedly noted throughout the case that only Ingrid may assert a wrongful-death claim

and that Ingrid was the only remaining plaintiff at the time of trial. And Textron was aware that Ingrid was also the only plaintiff whose claims were presented to the jury and the only plaintiff listed on the verdict form.

In short, the record thus reflects that Textron was clear-sighted about who the appropriate appellant was in this case. We have jurisdiction over the appeal. And we construe any ambiguity in the claims as technical drafting errors, not attempts by the estate to assert Ingrid's claims (or vice versa). We thus turn to Ingrid's evidentiary challenges.

EVIDENTIARY CLAIMS

Ingrid appeals the district court's denial of her motion for a new trial, which reiterated several evidentiary issues that had surfaced before and during the trial. These challenges can generally be grouped into two categories—challenges involving the *admission* of certain evidence (primarily, evidence of Goldstein's anxiety disorder) and challenges to court rulings *excluding* evidence.

Kansas law requires a party to "'make a specific and timely objection at trial in order to preserve evidentiary issues for appeal.'" *State v. Brown*, 307 Kan. 641, 645, 413 P.3d 783 (2018) (quoting *State v. Dukes*, 290 Kan. 485, 488, 231 P.3d 558 [2010]). The purpose of this objection requirement is to allow the district court to act as an evidentiary gatekeeper at trial—to rule on the admissibility of evidence based on specific arguments raised at trial, with the context of other evidence and testimony presented. See *State v. Garcia-Garcia*, 309 Kan. 801, 810, 441 P.3d 52 (2019). For this reason, the rule applies even when a court has previously ruled on the party's objection during a pretrial hearing; the evidence described there may differ from the evidence at trial. *State v. Sean*, 306 Kan. 963, 971-73, 399 P.3d 168 (2017).

10

And as a corollary, a party cannot object to the admissibility or exclusion of evidence on one ground at trial and then argue a different ground on appeal, as such actions undercut the purpose of requiring a specific objection at trial. *Garcia-Garcia*, 309 Kan. at 810.

With these principles in mind, we turn to Ingrid's multiple evidentiary claims.

1. *Ingrid has not shown that the district court erred in admitting evidence relating to Goldstein's anxiety disorder.*

While Ingrid raises several evidentiary claims, her primary argument on appeal concerns the district court's decision to allow Textron to present evidence relating to Goldstein's anxiety disorder. Ingrid asserts that this evidence was irrelevant to whether Textron caused the airplane crash. She also argues for the first time on appeal that this evidence was essentially presented as adverse character evidence against Goldstein, offered in the hope that the jury would not want to enter a verdict in favor of his heir.

Some additional context assists our discussion. Goldstein retired in 2013 but before that had been an airline transport-rated pilot and air traffic controller for 25 years. He was diagnosed with anxiety in 1997 after "he had an acutely disabling panic attack" during his work as an air traffic controller and another panic attack outside of work while watching TV. In 1999—and again in 2007—the FAA advised Goldstein that he must "'abide by Federal Aviation Regulations Section 61.53 relating to physical deficiency.'" In particular, the FAA explained that because of Goldstein's "'history of anxiety and obsessive-compulsive disorder,'" Goldstein was prohibited from operating an airplane "'at any time new symptoms or adverse changes occur, or any . . . time medication and/or treatment is required.'"

Goldstein's treating physician, Dr. Patricia Petrakis, testified at trial that Goldstein came to her seeking treatment for his anxiety for a short period in 2008 and then again in 2013. Dr. Petrakis testified that throughout 2013 and 2014, she prescribed Goldstein various medications for his anxiety disorder. Goldstein's prescriptions and dosages changed often as he and the doctor attempted to find a treatment plan that helped Goldstein's anxiety. At the time of the crash, Goldstein was taking 15 milligrams of Lexapro daily, along with 30 milligrams of BuSpar. Dr. Petrakis testified that this medication combination helped with Goldstein's anxiety as "much as it could," as any condition could fluctuate.

Goldstein never informed the FAA that he had "new symptoms or adverse changes" or that "medication and/or treatment" was being required to manage his anxiety disorder—as the FAA had previously instructed that he must. Instead, two months before the crash when Goldstein sought recertification of his medical certificate so he could maintain his license, he indicated there was "no change" to his mental health or medications.

Dr. Lawrence Lay—the FAA medical examiner who issued Goldstein's medical certificate in 2014—testified at trial that he would not have issued Goldstein a medical certificate if Goldstein had disclosed his use of medications and worsening symptoms of anxiety throughout 2013 and 2014. Instead, Dr. Lay would have deferred to the Kansas City Flight Surgeon (higher up the chain of command) to make the decision as to whether Goldstein could be issued a medical certificate.

Dr. Mitch Garber, one of Textron's expert witnesses, opined that the medications Goldstein was taking, in the manner he was taking them, and for the reason he was taking them, would have led the FAA to deny Goldstein's medical certificate if he had disclosed them to the FAA. Dr. Garber emphasized that "there was no question in my mind that he would not have been certified had he provided this information to the FAA."

12

Textron's counsel clarified the implication of Dr. Garber's opinion for this case: "Now, you're not telling the ladies and gentlemen of this jury that taking these two medications caused him to make the decisions he made during this emergency with the left engine power loss; are you?" Dr. Garber responded, "Not at all. The only significance of the medications is that it is a marker of the severity of the disease."

Dr. Garber further testified that research showed pilots with anxiety disorders can have symptoms that interfere with flying safely and successfully. That could include difficulty concentrating, trembling hands, "[p]alpitations, sensations of shortness of breath, chest pain, nausea, and dizziness," and having panic attacks.

Another expert witness testified that based on Goldstein's training, he would be expected to know what to do if the aircraft experienced left engine failure "in order to successfully fly that flight." Multiple witnesses at trial testified that the basic steps a pilot should take if the left engine fails—as Ingrid contended that the airplane's left engine did—is to immediately apply the right rudder, right pedal, and right aileron. But Goldstein did not take these steps—he had actually applied the left rudder, which was "exactly the opposite of what he should have been doing."

Other witnesses testified that the phrase "aviate, navigate, communicate" is the standard rule when pilots get into emergency situations. And "[c]ommunicate is the least important of those." But the cockpit voice record showed that Goldstein communicated that he had "lost the left engine" apparently before attempting to aviate or navigate.

Textron thus argued that all this evidence showed Goldstein's anxiety caused him to fail to act as a reasonable pilot would in the same circumstance and was ultimately the factual cause of the crash. Thus, it argued that this evidence relating to his history and treatment for anxiety should be admitted.

13

Ingrid challenges this ruling on appeal. She argues that the evidence of Goldstein's anxiety disorder and related medication was irrelevant because there was "no connection" between the crash and the evidence. We disagree.

Dr. Garber testified that pilots with anxiety can have symptoms that interfere with their ability to fly safely and complete flights successfully. And multiple other witnesses testified that Goldstein did not follow the steps that he should have known to take in the event of a left engine failure.

Relevant evidence is "evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). The district court had multiple discussions with counsel regarding the relevance and possible prejudice of evidence of Goldstein's anxiety disorder. At one point, the district court held that one of Textron's theories of defense was that "the symptoms of the anxiety contributed in part to decisions that were made in the cockpit" and that "the medication is relevant to establish that the anxiety had reached the point where it—it possibly could have concerned the FAA." The court also noted that the evidence potentially "cut both ways," as Ingrid would likely argue that the medications stabilized Goldstein's anxiety and allowed him to successfully pilot a plane.

The district court's ruling that the evidence was probative of Textron's theory of defense—that the symptoms of Goldstein's anxiety contributed in part to decisions that were made in the cockpit—is sound. Ingrid has not demonstrated that the court abused its discretion when allowing Textron's witnesses to introduce and explore this evidence.

Ingrid also argues for the first time on appeal that evidence of Goldstein's anxiety disorder was inadmissible character evidence. But Ingrid did not offer this explanation to the district court and does not explain why we can consider this argument now for the first time. See K.S.A. 60-404 (requiring a timely and specific objection to the admission

14

of evidence); *Garcia-Garcia*, 309 Kan. at 810 (parties cannot object to the admission of evidence on one ground and present a different rationale on appeal).

Lastly, Ingrid asserts that even if the information relating to Goldstein's anxiety was relevant to some extent, that relevance was substantially outweighed by the potential for undue prejudice from Goldstein's mental health. See K.S.A. 60-445. Ingrid argues that the undue prejudice relating to Goldstein's anxiety treatment was "compounded" by the exclusion of a National Transportation Safety Board (NTSB) report, which included a finding that "analysis of the pilot's autopsy and medical records found no evidence suggesting that either his medical conditions or the drugs he was taking to treat them contributed to his inability to safely control the airplane in an emergency situation."

As Textron notes, federal law defines the scope and boundaries of what portions of NTSB reports are prohibited from being admitted—and for what purpose—in civil actions for damages. See 49 U.S.C. § 1154(b); see also *Thomas Brooks Chartered v. Burnett*, 920 F.2d 634, 646-47 (10th Cir. 1990). It is unnecessary to venture into that realm, however, because our review of the record shows that the district court did not exclude the portion of the NTSB report that Ingrid references.

The district court had held before trial that based on federal law, any NTSB probable-cause determinations must be excluded—and the NTSB's finding that Goldstein's medical records did not point to his medical condition or medication as causing the accident was "one of the probable causes" and must be excluded accordingly. Yet as the trial progressed, the parties disputed whether certain portions of the report fell into this category—including the NTSB's finding that Goldstein's anxiety disorder did not contribute to the crash. The parties ultimately stipulated to the foundation of the NTSB report so that it could be admitted and agreed that they could argue about any necessary redactions at a later point.

That later point came, and during a lengthy bench conference, the district court appeared to agree with Ingrid that this portion of the report was not actually a probable-cause determination that must be excluded. The district court then suggested that Ingrid's attorney might ask the witness something along the lines of, "[Y]ou've read the NTSB report and you'll agree with me that there is nothing in the NTSB report that supports your conclusions[?]" Ingrid's attorney agreed that this was possible and used that approach during the trial.

Ingrid also successfully introduced other evidence at trial to counteract the evidence relating to Goldstein's anxiety treatment, including:

- Testimony from Ingrid's expert witness, Donald Sommer, that nobody ever came forward during the investigation of the crash and said anything related to Goldstein having anxiety or performing poorly.

- Testimony from Myron Zimpher—Goldstein's long-time coworker in air traffic control who also became his friend—describing in detail three specific instances where Goldstein acted calmly in stressful situations at work.

- Testimony from Ed Rowe—who trained Goldstein in flight school in the late 1990s and also became his friend—that Goldstein had "very, very high standards" for himself, and that Rowe never saw any "indications at all that he had anxiety or struggled. He was always eager to fly, and it was a joyful experience."

In summary, the district court did not abuse its discretion when it found that evidence of Goldstein's anxiety was relevant to determining what caused the crash and found that this relevance was not substantially outweighed by the potential for prejudice relating to Goldstein's mental health. We find no error in the admission of this evidence.

2.  *The district court did not admit hearsay testimony.*

Ingrid next argues that the district court erroneously permitted Scott Goodley, one of Textron's expert witnesses, to discuss hearsay statements in his testimony. But our review of Goodley's testimony shows that he never described an out-of-court statement. Thus, there was no hearsay evidence offered.

Again, this issue requires further factual background. A central dispute between the parties at trial was whether Textron's mechanics were required—based on the engine's manual—to perform a shop air test on the airplane after completing maintenance on the engines. Ingrid's maintenance expert opined that the manual required a shop air test be performed, while Goodley opined that the manual did not require the shop air test.

During a bench conference at trial, Ingrid's attorney stated that he anticipated that Textron would be offering hearsay statements through Goodley's testimony and objected to that anticipated evidence. Ingrid was concerned that Goodley would support his opinion by testifying that a representative of the engine's manufacturer—Pratt & Whitney—told Goodley that the shop air test was not required. The district court took the matter under advisement. The next day, the district court ruled that Goodley was permitted to identify the sources he consulted in forming his opinions but could not describe "what those sources told him."

Ingrid now identifies three portions of Goodley's trial testimony that she claims were inadmissible hearsay in violation of this ruling. First, Ingrid points to the following exchange between Textron's attorney and Goodley:

"Q: . . . When we broke, I was going through a list of the different kinds of things you had relied upon in coming to your various opinions in this case. We talked about the records in that book from that work order. We've talked about other resources that you

17

relied upon, the manuals and things. *Did you also make use of another resource—any other resources in forming your opinions?*

"A. *I did.*

"Q. *Did that include Pratt & Whitney—contacting Pratt & Whitney customer support?*

"A. *I did. I talked to technical support.*" (Emphases added.)

Second, Ingrid points to a similar exchange later in the day:

"Q. Again, in the process of reviewing all of this and coming to your conclusions about things like whether a shop air test was required or not, *did you consult with officials at Pratt & Whitney?*

"A. *I did.*" (Emphases added.)

*Third*, Ingrid points to a question by Textron's attorney during redirect examination, where the attorney began to read back a portion of Goodley's *Daubert* hearing transcripts:

"Q: Okay. And if you continue on to what Mr. Wolk showed the jury here, you—you continued to say, 'And going back further, I'd probably want to do the same thing. But since there were none of those issues, *I asked Brett—Brett the shop air test that they call out in the manual, and he's very familiar with PT6-Fs. He does the Pratt & Whitney—*

"MR. WOLK: I'd object. You already ruled on this.

"THE COURT: *Sustained*.

"MR. JONES: The door was opened, Your Honor.

"THE COURT: No.

"MR. JONES: Okay. Those are all the questions I have. Thank you, sir."
(Emphases added.)

Ingrid contends that the above pieces of testimony were all inadmissible hearsay. We disagree. Hearsay is "[e]vidence of a statement which is made other than by a witness

while testifying at the hearing, offered to prove the truth of the matter stated." K.S.A. 2024 Supp. 60-460.

The first two exchanges did not offer any out-of-court statements at all. In both, Goodley testified that he consulted with a representative from Pratt & Whitney but did not testify as to what that representative *said*. Thus, there was no "statement which is made other than by a witness while testifying at the hearing." K.S.A. 2024 Supp. 60-460. This line of testimony was thus consistent with the district court's ruling that Goodley could identify the sources he consulted in forming his opinions, but not what those sources told him.

While the third instance identified by Ingrid might have led to hearsay, Ingrid's attorney objected to that line of discussion. And the district court sustained that objection.

In short, Ingrid has not shown that the district court erroneously admitted any hearsay through Goodley's testimony.

3. *Ingrid has not shown that the district court erroneously excluded any evidence.*

Ingrid also challenges several decisions excluding evidence throughout the trial. Again, however, we find that Ingrid has not apprised us of any error in the district court's decisions.

3.1. *The district court did not err by excluding evidence of other airplane accidents.*

Ingrid first argues that the district court abused its discretion by excluding two videos of other King Air airplane accidents—one in Long Beach, California, and one in Addison, Texas. The district court found these videos to be of limited, if any, probative

19

value and excluded them, finding they were offered largely to incite the ire of the jury. We find this conclusion to be reasonable and well within the bounds of the law.

Before trial, Textron filed a motion in limine seeking to exclude the two videos Ingrid now discusses, along with evidence of other airplane crashes that Ingrid had identified as exhibits for trial. Textron argued in this motion that there was no evidence that these accidents were similar to what occurred with the airplane in this case. Specifically, the Long Beach accident did not involve a total failure of the left engine, but only a "momentary interruption" in power to the left engine due to water contamination in the fuel. The Addison crash involved a different model of airplane. These summaries are consistent with NTSB's reports on both accidents. The district court held that Textron's motion in limine was granted in part and denied in part "per ruling from [the] bench." We do not have a transcript of that ruling, however.

During trial, Ingrid requested a chambers conference to discuss the boundaries of the district court's order in limine and whether Ingrid could show the jury videos of the two crashes in Long Beach and Addison. Ingrid argued that the videos would help rebut Textron's experts, who testified that Goldstein did not take the proper steps to get the airplane under control before it crashed. And that Ingrid "wanted to use these on cross-examination to show that, in fact, [Goldstein] did perform correctly." Textron's counsel responded by reminding the court of the distinctions between those two accidents and what happened with the airplane in this case. The district court stated, "Well, my worry on the videos, I guess, is that . . . it seems to me we're mixing apples and oranges a bit." The court then excluded the videos.

On appeal, Ingrid points to *Rollins v. Kansas Dept. of Transportation*, 238 Kan. 453, 459, 711 P.2d 1330 (1985), where our Supreme Court explained that "[e]vidence of other accidents may be admitted if the court finds that the accident has a sufficient similarity with the accident in the case before the court." Ingrid contends that these

20

videos should have been admitted because she demonstrated that these other accidents were due to an engine failure, occurred on takeoff, and involved "a King Air B200 equivalent to or exactly the same as the accident aircraft." And thus "both accident videos which [Ingrid] sought to introduce regarded [a] Beech aircraft experiencing the same overall flight problem that doomed" the airplane here.

But contrary to Ingrid's assertions, the *Rollins* decision did not establish an absolute rule of admissibility. Instead, it entrusted an assessment of whether the accidents were sufficiently similar to render the videos relevant. 238 Kan. at 459. In that case, Rollins had attempted to introduce evidence of a car crash that occurred on the same stretch of highway; but in that crash, "the driver had gone off the highway when he swerved to miss a jackrabbit, while in the present case, there is no clear explanation why the right wheels ran off the edge of the road." 238 Kan. at 459. Thus, our Supreme Court held that "[w]hile there were numerous similarities in the two events, there were also dissimilar factors." 238 Kan. at 459. The court ultimately concluded that it could not say the district court abused its discretion in excluding the evidence.

In this case, the district court was persuaded that the differences between the videos of the two other airplane crashes and this crash warranted excluding the videos. We cannot say the district court abused its discretion in reaching this conclusion.

3.2. *The district court did not exclude evidence claiming that Textron "self-certified" its airplanes.*

Ingrid next argues that the district court abused its discretion by "excluding evidence of Beech's self-certification of airplanes." But as Textron notes, Ingrid's brief does not point to any adverse ruling by the district court in this regard. Indeed, our review of the record shows that the district court *allowed* Ingrid to discuss the FAA's certification process in depth—over Textron's objection.

Specifically, the jury heard testimony that no FAA representative ever flew with Beech (now known as Textron) during "Beech's certification" of the four-bladed B200. Instead, flight testing was done only by Beech employees, and the resulting inspection report was not sent to the FAA. Thus, Ingrid's claim that the district court denied the jury "the truth about the certification process" while making "contrary proof unavailable" is unsupported by the record. Ingrid has not apprised us of any error in this regard.

### 3.3. *The district court did not err in excluding evidence from another company's flight manual supplement.*

Ingrid next argues that the district court abused its discretion by excluding evidence from another company's flight manual supplement. One of Ingrid's main arguments at trial was that Textron had not published—and thus Goldstein could not have known—the velocity of minimum control in the air (or Vmca) "for an un-feathered and windmilling propeller for this B200 aircraft." Ingrid asserted that without this information, Goldstein had no idea how long he had to respond to the engine failure when it arose during the crash.

At trial, Ingrid sought to offer a flight manual supplement published by Raisbeck, a company that modifies airplanes, that included a Vmca for its modified airplane with four-bladed propellers without auto-feather. Ingrid wished to use Raisbeck's published Vmca to show the jury that another company thought it was important to list this information, even though Textron did not include the number in its manual. The district court held at trial that based on its order in limine, Ingrid could establish that Raisbeck published a Vmca for this situation and counsel could cross-examine on why Textron's manual does not include a similar Vmca. Thus, the only evidence that the district court excluded was the *actual number* for Raisbeck's published Vmca.

On appeal, Ingrid has not articulated why the specific Vmca listed in the Raisbeck manual was relevant or why its exclusion was problematic. Thus, she has not apprised us of any error in the district court's approach to this information.

But even if the district court did err in some way, any error would have been harmless. See K.S.A. 2024 Supp. 60-261. Ingrid's witnesses did offer testimony—over Textron's objection—that Raisbeck published a Vmca for the King Air B200 with four-bladed propellers and that this information would be "very important" for a pilot to know because it would "assist the pilot in understanding below what speeds the airplane will be uncontrollable in the event of a left engine failure with an auto feather not functioning." And at the close of trial, the jury returned a verdict that Textron *did* fail to provide adequate warnings to pilots. But the jury also found that this failure to warn was not a factual cause of the accident that resulted in Goldstein's death.

We thus find that the district court did not abuse its discretion by excluding the specific Vmca listed in the Raisbeck manual. And even if that information should have been offered, Ingrid has not shown that its admission would have affected the outcome of the trial.

3.4. *The district court did not err in excluding expert Mark Hood's opinion that a shop air test would have disclosed a leak in the Py line.*

Ingrid argues that the district court erred when it ruled that her expert witness, Mark Hood, could not opine that a shop air test would have disclosed a leak in the Py line, thus preventing the accident.

Hood was Ingrid's metallurgical expert. Before trial, the district court ruled that Hood's qualifications allowed him "to reliably opine on the state of aircraft components, how the specific component failed, and what types of events would cause that specific part to fail." But the court found that Hood was not qualified to testify "that a shop air test

23

would have disclosed a leak in the Py line before the incident." The court's decision was based on two reasons: Hood was "not an aircraft mechanic or aeronautical engineer," and Hood's reasoning that "a shop air [test] would have revealed a leak because that [was] the purpose of the test" was circular and not appropriate given Hood's lack of personal knowledge regarding shop air tests in general.

On appeal, Ingrid does not offer information to question the district court's ruling on Hood's expert qualifications; instead, she merely reiterates her belief that the information would have been relevant and would have assisted her case.

The district court's ruling was well-reasoned and sound, allowing Hood to testify as to those subjects in which he was an expert and excluding him from testifying as to a circular opinion that he did not have the background to support. Ingrid has not apprised us of any error in this reasoning or decision to limit Hood's testimony to the subjects he would be qualified to discuss.

      3.5.    *The district court did not err when it ruled that Ingrid's attorneys could not insinuate that Textron had caused parts of the airplane to go missing during the investigation.*

Ingrid also argues that the district court erred when it did not allow her attorneys to discuss two parts that had gone missing during the investigation. Ingrid asserts that these parts—the B-nut and the Py line—were critical to discovering what caused the accident. And she notes that her experts never had the opportunity to examine them.

Our review of the trial transcript paints a different picture from Ingrid's description in her brief, however. During the trial, multiple witnesses testified that during the course of the investigation after the crash, two pieces of the airplane—the B-nut and the Py line—were lost. The evidence showed that these items went missing sometime between

when NTSB conducted a wreckage inspection and when the parts were stored at Air Salvage in Dallas, Texas.

In a pretrial ruling, the district court had ruled that the parties were free to discuss the missing parts. But it also found that Ingrid could not attempt to insinuate that Textron had somehow made the parts disappear during the investigation to prevent her attorneys from discovering the cause of the accident—an argument that was based entirely on speculation without any corroborating evidence. At trial, the district court sustained Textron's objection when Ingrid's attorney repeatedly argued that Textron was responsible for this missing evidence.

Kansas law permits a court or factfinder to draw an adverse presumption about the nature of missing evidence when a party who has "unique control over that evidence" fails to produce it. *Becker v. Knoll*, 301 Kan. 274, 280, 343 P.3d 69 (2015). On appeal, Ingrid does not argue that she had laid a proper foundation explaining why Textron should have been held responsible for the missing parts. Instead, she merely reiterates that she would have liked to argue Textron's culpability to the jury.

It is the responsibility of an appellant to apprise the reviewing court of error. This includes providing all information necessary to explain why the district court should have ruled differently on an evidentiary claim. Ingrid has not made this showing here.

3.6. *Ingrid has not pointed to any adverse ruling pertaining to Goldstein's future earnings.*

In her final evidentiary challenge, Ingrid argues that the district court improperly limited evidence of Goldstein's future earnings, which would have defined the scope of her damages. Textron argues that evidence relating to Goldstein's lost income was not

relevant or recoverable in Ingrid's wrongful-death claim. Instead, she was required to show what her losses were based on Goldstein's filial care, attention, or protection.

The record surrounding this claim is somewhat problematic. Ingrid did not cite to any rulings related to any exclusion of evidence regarding Goldstein's future earnings or proffer what the specific evidence would be. Ingrid's brief indicates that the court ruled that evidence of Goldstein's lost income as a pilot was inadmissible because Goldstein's anxiety medications made it impossible for him to continue in that occupation. But the record does not support that conclusion.

Before trial, Textron requested that the court exclude an expert opinion relating to Goldstein's "lost income"—but not for any reason related to Goldstein's medication use. The district court held that Textron's motion in limine was granted in part and denied in part "per ruling from [the] bench." But the record on appeal does not include any hearing transcript of such rulings, or any other order by the district court excluding evidence of Goldstein's future earnings. In Kansas, it is a "'well-established rule that an appellant has the burden to designate a record sufficient to establish the claimed error. Without an adequate record, an appellant's claim of alleged error fails.'" *State v. Vonachen*, 312 Kan. 451, 460-61, 476 P.3d 774 (2020). Thus, the basis for the district court's ruling, along with the context in which Ingrid tried to introduce this evidence at trial, is unclear.

We could decline to consider Ingrid's claim regarding the lost-income evidence on this basis alone. But on a more fundamental level, Ingrid has not demonstrated how this damages evidence would have changed the outcome of the trial. See K.S.A. 2024 Supp. 60-261. After hearing all the evidence, the jury found that Ingrid had not shown that any action by Textron caused the crash that led to Goldstein's death. Evidence relating to damages is largely academic without this causal link.

Again, Ingrid has not apprised us of any error in the district court's decision.

26

3.7.    *Ingrid has not identified any errors that would accumulate to undermine the fairness of the trial.*

Ingrid asserts that even if these alleged evidentiary errors do not individually require reversal, their combination undermined confidence that she received a fair trial. But a party cannot claim cumulative error if they do not apprise us of any error. *State v. Lowry*, 317 Kan. 89, 100, 524 P.3d 416 (2023). Ingrid has not shown that the district court abused its discretion in rendering any evidentiary ruling in this case. Her claim based on cumulative error is similarly unavailing.

No trial is perfect. Our state's courts have long held that litigants are not entitled to a perfect trial but are instead entitled to a *fair* one. *Walker v. Holiday Lanes, Inc.*, 196 Kan. 513, 520, 413 P.2d 63 (1966). Ingrid's jury trial was nearly three weeks long and included hundreds of exhibits and live testimony of many witnesses. And while Ingrid contested eight of the district court's evidentiary rulings on appeal, she succeeded on countless more evidentiary objections. The district court conducted the trial in a reasoned and impartial manner, carefully considering the evidentiary issues raised by both parties. After carefully reviewing the voluminous record on appeal, we are confident that Ingrid received a fair trial in this case.

Affirmed.